HERIGSTAD, RESPONDENT, v. HARDROCK OIL CO., APPELLANT.

(No. 7,447.)

(Submitted November 9, 1935. Decided November 27, 1935.)

[52 Pac. (2d) 171.]

24

Mr. *La Rue Smith* and Mr. *S. C. Ford*, for Appellant, submitted a brief; Mr. *Ford* argued the cause orally.

26

*Mr. Louis P. Donovan,* for Respondent, submitted a brief and argued the cause orally.

28

MR. JUSTICE MATTHEWS delivered the opinion of the court.

The defendant, Hardrock Oil Company, a Montana corporation, has appealed from a judgment in favor of the plaintiff, O. B. Herigstad, on the pleadings setting up and admitting the following facts:

In 1921, one Guy Craig secured from the federal government a permit to prospect a quarter-section of land for oil and gas, and, on May 24, 1926, entered into an "operating agreement" with one William D. Campbell, trustee. By the terms and conditions of this agreement Craig granted to Campbell the sole and exclusive right of possession of the north half of the quarter-section for the purpose mentioned in the permit, and agreed to apply for and, if possible, obtain a lease from the government at the proper time, reserving to the government a 5 per cent. royalty, and to assign the lease to Campbell on demand. Campbell agreed to do and perform all things required of Craig by the permit and to pay Craig 15 per cent. of all oil or gas produced and saved by the operation, and, within 35 days after completion of a well which will produce 500 barrels of oil on a 30-day test, to pay Craig "or order" $2,000 in cash. The document concludes with the agreement that, subject to the laws and regulations of the United States, the "assignment of the rights, obligations, covenants and benefits hereof shall extend to and bind, or inure to the benefit of, the heirs, successors and assigns of the parties hereto." The instrument was duly recorded on June 1, 1926. Also, on May 24, 1926, Craig assigned to this plaintiff his contingent right to receive the $2,000 compensation.

On May 26, 1927, Campbell, trustee, assigned, conveyed and transferred to Magic City Oil Company "all his right, title and interest in and under" the operating agreement, and, on October 26, 1927, the Magic City Oil Company entered into an "operating agreement" with the defendant company. This

agreement designates the Magic City Oil Company as the "owner" and the defendant the "operator." It recites the issuance of the permit to Craig and the fact of his entering into the operating agreement with Campbell, trustee, and declares that the same was "regularly assigned unto the said owner" by Campbell, trustee, and that the "owner" has succeeded to all the rights "of Campbell, trustee," and is "now vested with all the oil and gas rights in and to the lands last above described and is now entitled to eighty per cent (80%) of all oil and gas that may be produced from said lands, together with the right to possess said lands * * * for development purposes." This agreement specifically provides that "the operator [this defendant] agrees to comply with all the terms and conditions of the prospecting permit and the operating agreement hereinabove referred to and with the terms and conditions of any Government lease that may be issued pursuant to said prospecting permit in so far as said prospecting permit, operating agreement, and subsequent leases cover the land included within this contract and upon its failure to do so, or upon the operator's failure to comply with the terms and conditions hereof, it shall forfeit all right hereunder, and shall re-convey to the owner all rights covered by this contract."

After the execution of this contract, the defendant entered upon and took possession of the lands described and drilled a well thereon which was completed on or about the fourth day of February, 1928, and which, on a 30-day test, produced more than 500 barrels of oil.

On March 1, 1928, Craig secured from the government an oil and gas lease upon the quarter-section mentioned in his permit, and on July 18, 1928, assigned the lease, subject to the approval of the Secretary of the Interior, to this defendant, and it assumed, and agreed to discharge, any and all obligations resting on Craig under the Craig-Campbell operating agreement. This assignment reserved to Craig a 15 per cent. royalty from the north half of the quarter-section mentioned in the operating agreement, and a 12½ per cent. royalty from

the south half of the quarter-section. As more than 35 days had elapsed after the bringing in of the well and before the assignment of the lease, the $2,000 mentioned in the operating agreement became due and payable before the assignment of the lease; this sum was not mentioned in the assignment. No part of the $2,000 having been paid, plaintiff, on January 15, 1930, brought action to recover that amount, with interest from and after March 10, 1928, and for costs. On these facts, properly pleaded and not controverted, the court rendered its decision and entered judgment in favor of the plaintiff.

The position taken by the defendant is that the prospecting permit did not vest in Craig any interest in the lands described; that the contingent agreement to pay the $2,000 was not a covenant running with the land; that the assignment of the Craig-Campbell operating agreement to the Magic City Oil Company did not render the assignee personally liable for moneys thereafter to become due, regardless of the fact that the contract purported to bind the assignees of the respective parties, and that this agreement was not assigned to the defendant; that defendant did not agree to pay any money to the plaintiff as Craig's assignee; and that the court's findings and judgment cannot be affirmed on any theory of liability. It is further suggested that the failure of the defendant to make payment should only give rise to a forfeiture of its rights under the operating agreement. The defendant contends that authorities cited sustain this position and particularly that "the precise situation obtaining between appellant and respondent is illustrated and the rights of the parties determined by the case of *Pen-O-Tex O. & L. Co.* v. *Big Four O. & G. Co.*, (C. C. A.) 23 Fed. (2d) 154, which decision is peculiarly applicable and is controlling of the question here presented."

Parenthetically it may be said that decisions of sister states, when applicable, may be persuasive, but are never "controlling." However, after a careful reading of the decision thus relied upon, we are of the opinion that it is not even persuasive here, due to the marked difference in fact conditions upon

which the declarations relied upon by defendant are based. There the owner of a large tract of land leased to one Kukendall, who assigned a portion of his lease to one Cranston; the latter entering into a separate contract to drill on the premises. Cranston assigned his portion of the lease and his drilling contract to the Pen-O-Tex Company. "Pen-O-Tex then entered into a contract with Fairchild (extending to their heirs, successors, etc.) whereby he engaged to drill the well," but no well was drilled within time, whereupon Pen-O-Tex entered into a contract with the Pittsburg Western whereby it agreed to sell and assign a portion of its leased sections to the latter "with an understanding by that company to assume all the obligations of the Pen-O-Tex in the drilling contracts. This contract * * * did not extend to their successors and assigns." The Pittsburg Company on the same day entered into a like contract with the Big Four agreeing to sell and assign a half interest in the sections "now owned" by it; the latter agreeing to assume its proportion of the former's obligations to the Pen-O-Tex. No well was drilled and no rent paid, and suit for damages was instituted. The plaintiff's contention that "every successive assignee of a lease, however remote in the devolution of the leasehold title, is liable to a preceding holder on an obligation of the lease breached during their joint interest and consequent privity of estate" was held untenable for the following reasons: "The doctrine of covenants running with the land is based on an essential legal fact that some estate to which the covenant may attach as its vehicle or conveyance has been transferred." There was a drilling contract, but *no* assignment of any portion of the lease, as the defendant and its predecessor did merely "agree to sell and assign"; the court declaring that "an agreement merely to assign a lease is not an assignment of the lease itself, for in such an agreement no present transfer of the estate or of a lesser interest in the estate is intended or involved. In consequence such an agreement does not establish privity of estate in the parties or cause covenants of the lease to run to either of them." The defendant asserts that this decision is applicable because Craig

agreed to assign the government lease when secured, and no lease was secured until after the defendant discovered oil; but the two cases differ in this: In the *Pen-O-Tex O. & L. Co. Case,* the lessor was held to have assigned no interest in the ''estate'' but merely to have *agreed* to assign at some future day—an executory contract. Here Craig assigned all that he had—the right of exclusive possession of the lands described for the purpose of prospecting for oil and gas.

The ''prospecting permits'' issued under authority of the Act of Congress (Feb. 25, 1920, Chap. 85, sec. 13, 41 Stat. 441, 30 U. S. C. A., sec. 221) constitute more than a license to the permittee, and, if exclusive possession for a definite period creates an interest in land, they have this effect, for such a permit grants, in writing, ''the exclusive right, for a period not exceeding two years, to prospect for oil or gas'' upon a selected tract, not exceeding 2,560 acres, which time may be extended under certain conditions (sec. 224, 30 U. S. C. A., p. 402). Discovery of oil or gas entitles the permittee to a lease on one-fourth of the land included in the permit upon a royalty of 5 per cent. in amount of value of the production, and to a preference right to a lease on the balance of the land, on a 12½ per cent. royalty. (Sec. 223, 30 U. S. C. A., p. 401.) After production of oil or gas, the permittee is entitled to that produced, until application for the lease, on payment of 20 per cent. of the gross value to the government. (Sec. 224, 30 U. S. C. A.) It is true, as asserted by defendant, that the permit is not assignable without the consent of the Secretary of the Interior, but, on suit by an assignee, the defendant cannot take advantage of this departmental regulation. (*Isaacs* v. *De Hon,* (C. C. A.) 11 Fed. (2d) 943.)

Under the Act and the authorities, the government ''prospecting permit'' would seem to be practically equivalent to the ordinary lease of privately owned land thought to contain oil and gas; the government merely adopts a different method of handling the matter. The private owner executes a so-called ''lease'' in the first instance, which authorizes the lessee to hold exclusive possession of the land for the purpose of pros-

pecting for oil and gas, and it is generally held that such a "lease" does not vest in the lessee an estate in the land or in the oil and gas therein, but simply the right to prospect for oil and gas, "a sort of subterranean *ferae naturae*," to which no title vests until reduced to possession by extraction from the earth; an incorporeal hereditament. (*In re Indian Territory Illuminating Oil Co.*, 43 Okl. 307, 142 Pac. 997; *National Oil & Pipe Line Co.* v. *Teel*, 95 Tex. 586, 587, 68 S. W. 979; *Richlands Oil Co.* v. *Morriss*, 108 Va. 288, 61 S. E..762; *Crawford* v. *Ritchey*, 43 W. Va. 252, 27 S. E. 220; *Venture Oil Co.* v. *Fretts*, 152 Pa. 451, 25 Atl. 732; *Eastern Ohio Oil Co.* v. *McEvoy*, 75 Kan. 515, 89 Pac. 1048; *Barnsdall* v. *Owen*, (C. C. A.) 200 Fed. 519.) This is exactly the situation of the holder of a government "permit." "The permit is itself an act of the Land Department, final so long as it lasts, and though in its inception a mere license conveying no estate in the land, it is a final grant of a valuable right pursuant to law which ought to be secured to the person to whom the law gives it." (*Witbeck* v. *Hardeman*, (C. C. A.) 51 Fed. (2d) 450, 452, affirmed 286 U. S. 444, 52 Sup. Ct. 604, 76 L. Ed. 1217.) This "grant of a valuable right" does not differ from the grant contained in the ordinary oil and gas lease executed by the individual owner, and, whatever the rule may be in other states, in this jurisdiction such a right is held to take "the character of an interest or an estate in the land itself. It is an interest in the land, although incorporeal." (*Marias River Syndicate* v. *Big West Oil Co.*, 98 Mont. 254, 38 Pac. (2d) 599, 601), and is sufficiently an "interest in real estate" to support an attachment. (*Williard* v. *Federal Surety Co.*, 91 Mont. 465, 8 Pac. (2d) 633.)

While the contracts subsequent to the prospecting permit are termed "operating agreements," they are, in substance and effect, leases and not mere licenses or contracts of employment. Mere nomenclature is unimportant. "The test to determine whether an agreement for the use of real estate is a license or a lease is whether the contract gives exclusive possession of the premises as against all the world, including the

owner, in which case it is a lease." (1 Thompson on Real Property, 761, and cases cited; 35 C. J. 954; 1 Thornton on Law of Oil and Gas, 185 and 210, note 50.)

Another case on which defendant strongly relies, but which is clearly distinguishable from the case at bar, is that of *Consolidated Arizona Smelting Co.* v. *Hinchman*, (C. C. A.) 212 Fed. 813, 816. There the "Blue Bell Company," owner of certain mining properties, entered into a contract with one Elliott to "convey the property by warranty deed," on payment of $100,000, with the further agreement that the purchaser should pay to the company 25 per cent. of the net profit from operating the mines until an additional sum of $900,000 should have been paid. Elliott assigned the contract to the Consolidated Company, which made the payment required and secured the warranty deed; a supplemental agreement was then entered into wherein the Consolidated Company expressly agreed to make the future payments of 25 per cent. of the net profits to the Blue Bell Company, and it was therein recited that: "This agreement shall be binding upon and inure to the benefit of the successors and assigns of the respective parties." The purchaser thereupon conducted mining operations on the property, evidently at a loss, for it became bankrupt. The property was duly sold by a trustee in bankruptcy to the defendant Hinchman, and the question then arose as to whether or not such a purchaser could be compelled to operate the property for the purpose of paying 25 per cent. of the net profits (if any) to the original owner of the property. The court held that such a covenant did not run with the land, but was merely personal; an agreement to share profits. The court declared: "We must not lose sight of the very substantial difference between an agreement to pay $900,000 as an agreed value for land and an agreement to give a quarter share of profits, if there are profits, with a maximum of $900,000. The present worth at the date of the deed of such a prospective share or chance in a mining venture is wholly conjectural. The covenantor does not acknowledge that the present value of the mines * * * is by any specific sum more than the

cash payment." The $900,000 was held not to be a part of the consideration for the deed which passed the full title to the property to the "covenantor" who "has not expressly agreed that it will not alienate or encumber the land" or that "the land should stand as security for the performance of the covenant." The court declared: "The difficulty in the complainant's case is that the grantor took in addition to a satisfactory purchase price merely a chance in a mining venture, and took no security that this venture should last longer than the ability or interest of the coadventurer, the bankrupt." The court distinguished that case from *Portland Chemical & Phosphate Co.* v. *Blodgett,* 152 Fed. 929, 82 C. C. A. 77, wherein the fact conditions more nearly approximate those in the instant case. There the land involved was sold for the stipulated price of $100,000; $30,000 paid on delivery of the deed and the balance to be paid in royalties over a period of five years, with the specific agreement that title should not be conveyed or encumbered during that period. "The effect of this was expressly to charge the land with a fixed and agreed purchase price."

A third case in support of defendant's contention is that of *Fisher* v. *Guffey,* 193 Pa. 393, 44 Atl. 452, 453. The opinion is short and, without the citation of authorities, holds that where the plaintiff sold a number of leases to one Tomb, on consideration of $500 paid at the time and the agreement to pay an additional $1,000 if oil was produced, and the agreement was subject to the rents and royalties fixed in the Fisher leases, the provision for the $1,000 payment "was merely a bonus" which did not run with the land in the absence of "an intention to create a charge," and was therefore not binding upon the assignee of Tomb. There is no indication in the opinion that the agreement or assignment contained any provision with respect to the successors and assigns of the parties, and the opinion contains the significant declaration that: "It is within the power of the plaintiff, while holding the leasehold interest, to exact covenants which would bind a subse-

quent assignee in possession of the land, but that he did not do so is manifest.''

While in the oil industry a cash payment, after production, is termed a "bonus," the agreement to make such payment in lieu of paying royalty, or in addition to royalty, is nevertheless the consideration, or a part thereof, for the execution of the lease. (See *Thurman* v. *Moore,* 178 Ark. 885, 13 S. W. (2d) 22.)

In the case of a lease which provided for the payment of $2,000 "in case the first should be a paying well" and the "defendants by various assignments and conveyances became the owners of said lease" and drilled a "paying well," it was held that the covenant to pay ran with the land, and that "where a covenant between lessor and lessee relates to a thing not *in esse* but which is yet to be done upon the land tending to enhance its value, \* \* \* the assignees if named are also bound.'' (*Montgomery* v. *Hickok,* 188 Ill. App. 348.) So here, the defendant "by various assignments and conveyances" succeeded to the rights of Campbell, and as the final assignee specifically agreed to be bound by the covenants of the Craig-Campbell agreement with respect to a covenant relating to "a thing *in esse,*" the condition as to which was fulfilled.

The general rule is that "an assignee of an oil and gas lease is liable for covenants maturing while the title is held by him, because of privity of estate, but he is not liable as to those previously broken or subsequently maturing, because of the absence of any contract relations with the lessor. While he holds the estate under the assignment and enjoys its benefits, he bears its burdens by an assignment of the lease, or of the interest he obtains under the assignment to him." (Note, 79 A. L. R. 497; see, also, 1 Thornton on Oil and Gas, 283.)

And whatever the rule may be elsewhere, in this jurisdiction, while the assignment of a contract does not relieve the assignor from liability, an assignee who assumes the obligations of the contract becomes primarily liable for their discharge, and the assignor remains but secondarily liable, and the payee,

or his successor, may sue either the assignor or assignee alone, or the two jointly. (*Kinyon Investment Co.* v. *Belmont State Bank,* 69 Mont. 282, 221 Pac. 286; *Murray* v. *Creese,* 80 Mont. 453, 260 Pac. 1051; *United States B. & L. A.* v. *Burns,* 90 Mont. 402, 4 Pac. (2d) 703; *Brown* v. *Homestake Exploration Co.,* 98 Mont. 305, 39 Pac. (2d) 168.)

Having secured a valuable right, and, in consideration for its assignment, assumed the obligations of the assignor and continued to hold the title until the obligation to pay had matured, the defendant is liable therefor. It is true that the right to receive payment had been assigned long prior to the date on which it became payable, but "a valid assignment may be made of debts that are contingent and of money to become due in the future or on the performance of an existing contract, although the contract itself under which the money is to become due is not assignable." (5 C. J. 866.)

As the defendant assumed the payment to Craig or his order, the plaintiff here is the real party in interest and entitled to maintain the action. (Sec. 9067, Rev. Codes 1921; *Merchants' National Bank* v. *Great Falls Opera-House Co.,* 23 Mont. 33, 57 Pac. 445, 75 Am. St. Rep. 499, 45 L. R. A. 285.)

The trial court was correct in its conclusions; the judgment is affirmed.

Associate Justices Stewart, Anderson and Morris concur.

Mr. Chief Justice Sands, absent on account of illness, takes no part in the foregoing decision.