No. 14755

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

---

U. V. INDUSTRIES, INC.,
A corporation, et al.,

                    Appellants,

        -vs-

RUSSEL D. DANIELSON, ROBERT
V. DANIELSON, and MYRNA BRODHEAD,

                    Respondents.

---

Appeal from:  U. S. District Court, Billings Division,
              Hon. U.S. District Judge James Battin, presiding.

Counsel of Record:

    For Appellant:

        Crowley, Haughey, Hanson, Tool & Dietrich, Billings,
         Montana
        Cale Crowley argued, Billings, Montana

    For Respondents:

        Raymond K. Peete argued, Billings, Montana

---

                        Submitted: September 18, 1979

                        Decided:  NOV 1 1979

Filed: NOV 1 1979

_Thomas J. Kearney_
                                    Clerk

Mr. Justice Gene B. Daly delivered the Opinion of the Court.

This matter is before this Court on certification from the United States District Court for the District of Montana. Plaintiffs-respondents are grantees under a mineral deed from the owner and lessor of the oil and gas beneath the E1/2 of section 10 in Richland County, Montana. Defendants-applicants are the lessee and its assigns under the "Danielson" oil and gas lease covering this tract; some of the applicants are or were also lessees under the "Lewis" oil and gas lease covering an adjacent tract, the NW1/4 of section 10. On May 12, 1975, respondents, the grantees, brought suit in state District Court in Richland County, requesting damages from the applicants for the period between February 3, 1970 and September 14, 1972, for failure to drill an offset well to protect their oil interests from drainage by a producing well on an adjacent tract of land (Lewis lease). The case was removed to the United States District Court for the District of Montana, which has certified several issues to this Court for declaratory judgment regarding applicable Montana law, on application of the lessees pursuant to Rule 1 of the Rules of this Court.

The facts in this case are complex, but the parties are in substantial agreement as to those facts, which follow in summary form. There are two oil and gas leases involved in this suit--the "Danielson" lease covering the E1/2 of Section 10, and the "Lewis" lease covering the adjacent NW1/4 of Section 10. On December 30, 1968, Hilda Danielson, respondents' mother and predecessor in interest, executed a five-year primary term, "unless delay rentals" oil and gas lease ("Danielson" lease) to applicant Empire State Oil Co., which subsequently assigned it to the other applicants.

This lease contained a clause providing that no change in ownership of the mineral interest would be binding upon the lessee until it received written notice thereof. On July 24, 1970, Mrs. Danielson conveyed her interest to her five children, three of whom are respondents, in a mineral deed subject to the existing lease. The deed was recorded on September 20, 1971.

Meanwhile, a producing well was completed by King Resources Co. on the adjacent Lewis tract on February 3, 1970. Two of the applicants, U. V. Industries, Inc. (through its predecessor United States Smelting, Refining and Mining Company), and Wolf Corporation were at relevant times part owners of this leasehold interest in the Lewis tract. Under the dates July 1 and July 26, 1972, U. V. Industries received letters on behalf of two of the plaintiffs demanding that U. V. Industries drill an offset well in the NE1/4 and compensate them for drainage resulting from production from the well on the adjacent Lewis lease. This demand was refused. U. V. Industries first received a copy of the mineral deed from Mrs. Danielson to her five children on August 2, 1972. All delay rentals through December 1972 were paid and accepted.

Prior to September 14, 1972, the spacing of wells drilled on Section 10 was governed by statewide spacing orders issued by the Board of Oil and Gas Conservation. The statewide spacing order governing well spacing in the formation and depth to which the Lewis well was drilled in effect at the time the well was drilled provided that one well could be drilled and operated on each quarter section (160 acres). This order was changed by the Board's Order No. 16-71 of May 13, 1971, which provided that one well

-3-

could be drilled and produced on 320 acres at this depth. Under the May 13, 1971 order, the 320 acre spacing unit would be composed of two contiguous north-south or east-west quarter sections designated by the lease operator, which did not necessarily have to be within the same section.

On September 14, 1972, the Montana Oil and Gas Conservation Board held a hearing at which respondents and applicant U. V. Industries were represented. The Board issued a specific well spacing order superseding the statewide spacing order for the particular production field involved in the present controversy (Lonetree Creek field). This order designated the N1/2 of Section 10 as a production spacing unit. The designated well spacing unit includes the existing, producing Lewis well on the NW1/4 and it also includes the NE1/4 owned by the respondents, where they are alleging applicants had a duty to drill an offset well. Subsequently, on September 15, 1972, all parties entered a voluntary pooling and unit agreement covering this field.

Respondents brought the present action seeking damages under the common law "offset drilling rule." The common law theory implies in every oil and gas lease a covenant on the part of the lessee to protect the premises of his lessor from drainage of an adjacent producing well by drilling an offset well.

The threshold issue is: (1) Whether or not the common law judicial remedy of a civil suit for damages in state District Court under the offset drilling rule has been abolished by enactment of the 1953 Montana Oil and Gas Conservation law; i.e., does the Board of Oil and Gas Conservation have exclusive jurisdiction to determine such controversies? If this question is determined adversely to

applicants, there are several subsidiary issues:

(2) Was the lessor or her grantees (respondents) required to serve written notice or demand on the lessee or its assigns (applicants) to drill an offset well; if so, did the lessee have a reasonable time thereafter in which to comply; and, when does the obligation of the lessee, if any, to pay damages commence?

(3) What is the effect of the "no change in ownership until written notice" clause in the lease and certain provisions of the mineral deed on the rights of the parties?

(4) What is the appropriate statute of limitations?

The applicants' contentions are as follows:

Issue #1. Enactment of the 1953 Oil and Gas Conservation Act, sections 82-11-101 et seq., MCA, has eliminated and abolished actions to prevent drainage by producing wells on adjacent land based on the common law offset drilling rule theory. The power to conduct public evidentiary hearings, issue subpoenas, establish well spacing units, order involuntary pooling of interests within the same, grant or deny permission to drill wells, prevent waste and protect correlative rights is now committed by statute to the discretion of the Board of Oil and Gas Conservation. State District Courts, therefore, no longer have jurisdiction to entertain and decide an isolated part of the whole scheme of discretionary administrative determinations vested in the Board by statute. Involuntary pooling of interests within a well spacing unit by order of the Board affords the same kind of relief as was formerly granted by the common law judicial remedy of a civil suit for damages in the state District Court under the offset drilling rule. At any time after they acquired their interest and before the Board

order of September 14, 1972, plaintiffs-respondents had the statutory right to apply to the Board of Oil and Gas Conservation for relief but did not do so. No implied covenant can exist which would authorize a District Court to require a lessee to drill an offset well without permission of the Board, or one which would, if drilled, violate statutory purposes or restrictions or a valid order of the Board, nor award damages if the lessee failed to do so.

Second, the same issues of fact regarding the extent and location of the reservoir or pool with respect to the lands, and whether or not the Lewis well does in fact drain oil from beneath the NE1/4, are involved in both a common law action based on implied covenant and any statutory proceedings before the Board. Plaintiffs-respondents cannot collaterally impeach the Board's determination of these same factual issues, which it has already decided and which are res judicata. Furthermore, the District Court cannot invade the power to make discretionary determinations vested by statute in a state board such as where, how many, and under what circumstances wells can be drilled and the spacing and pooling thereof. It cannot substitute its discretion for a valid discretionary order made by the Board.

Third, plaintiffs-respondents waived their right, if any, to require applicants to drill an offset well to protect them from drainage by a producing well on the Lewis tract by their acceptance of delay rental payments through December 1972.

Issue #2. The following arguments need only be considered if the Court determines the threshold issue adversely to the applicants; that is, if the Court decides that the remedy of a civil suit for damages in the District Court is

still available for a lessee's breach of the implied cove-nant to protect his lessor from drainage by drilling an offset well. First, the lessor or her grantees were required to serve written notice or demand on the lessee or his assigns (applicants) to drill an offset well. This is required under the common law drilling rule. Berthelote v. Loy Oil Co. (1933), 95 Mont. 434, 28 P.2d 187. Since no notice or demand was made until the demand letters of July 1 and July 26, 1972, applicants could not be under any duty to drill an offset well before those dates. Furthermore, the law gives a lessee a reasonable time in which to drill an offset well following demand by his lessor, and subjects the lessee to damages for failure to do so only after a reason-able time has passed. Applicants here did not have a rea-sonable time to comply after they received notice, because a reasonable time would be longer than the two and one-half months that elapsed before the parties entered a voluntary pooling and unit agreement. Therefore, the obligation to pay damages never accrued.

Issue #3. The oil and gas lease from Hilda Danielson to Empire State Oil Company provides that "[n]o change in the ownership of the land or assignments of rentals or royalties shall be binding on the lessee until after the lessee has been furnished with a written transfer or assign-ment or a true copy thereof . . ." and the mineral deed from Hilda Danielson to the three plaintiffs-respondents provided that it was subject to any rights existing in the lessee or its assigns. The law recognizes the validity of such "no change in ownership" clauses, and because applicants re-ceived no actual or constructive notice that Hilda Danielson had conveyed her interest to plaintiffs until August 2,

1972, plaintiffs cannot assert any rights against the defendants before that date under the terms of the lease.

Issue #4. This action is barred by Montana's two-year statute of limitations for waste or injury to real or personal property in section 93-2607, R.C.M. 1947 (subsequently amended in 1975, and now sections 27-2-207 and 27-2-303, MCA).

All parties are in agreement that the common law offset drilling theory was the applicable rule in Montana, at least before enactment of the 1953 Oil and Gas Conservation Act. The offset drilling rule was recognized in Berthelote v. Loy Oil Co. (1934), 95 Mont. 434, 28 P.2d 187, 190, and Severson v. Barstow (1936), 103 Mont. 526, 63 P.2d 1022, 1024-25. This common law rule implies in every oil and gas lease a covenant on the part of the lessee to protect the premises of his lessor from drainage by an adjacent producing well by drilling an offset well. Severson v. Barstow, supra. The purpose of implied covenants in general is to give effect to the intention of the parties to the lease. The intention of the parties is to produce oil and gas for a profit, which is recognized by the lessor as production royalties, the primary consideration he receives for his lease. Severson, 63 P.2d at 1024; Berthelote, 28 P.2d at 190. Generally, the implied covenant to protect the premises from drainage by drilling an offset well is strictly applied, particularly when the lessee has an interest in the adjacent acreage on which the draining well is located, because of the permanent loss of oil that results to the lessor when it is drained from beneath his land. Gordon, Remedies for Breach of Implied Covenants in Oil and Gas Leases in Montana (1967), 28 Mont.L.Rev. 187, 192-93. The implied duty of the lessee

to protect the land from drainage is a duty to exercise reasonable care and diligence to prevent substantial drainage from the leased lands by drilling offset wells. "Reasonable care and diligence" is defined as that which a reasonably prudent operator would do under all of the circumstances of the particular situation to protect the interests of both the lessor and the lessee. 2 Summers, Oil and Gas, §399, p. 572 (1968).

Issue #1. The first question certified to this Court by the United States District Court is whether or not the 1953 Montana Oil and Gas Conservation Act has abolished the common law offset drilling rule and the judicial remedy of a civil suit for damages in state District Court. The primary purpose of the Act is to prevent "waste" of oil and gas, as that term is defined, by vesting power in the Board of Oil and Gas Conservation to regulate the drilling, producing, and spacing of wells and the pooling and utilization of oil and gas interests. Sections 82-11-101, -111, -121, -124, -201 and -205, MCA. The Act is largely based upon model legislation for an oil and gas conservation statute promulgated by the Interstate Oil Compact Commission. Marchi, Conservation in Montana (1955), 17 Mont.L.Rev. 100, 102. The Montana Act, however, does not contain the provisions of the model law, nor any provisions whatsoever, directly relating to the protection of correlative rights. "Montana's Act makes no reference to 'correlative rights.'" Pattie v. Oil and Gas Conservation Commission (1965), 145 Mont. 531, 402 P.2d 596, 599. This fact is important to an understanding of the three cases which have been decided to date under Montana's 1953 Oil and Gas Conservation Act.

Nothing in the Act expressly abolishes the common law offset drilling rule or the judicial remedy of a civil suit for damages. Nevertheless, the Board of Oil and Gas Conservation has broad powers to conduct evidentiary hearings, establish well spacing units, order involuntary pooling of interests within such units, grant or deny permission to drill wells, and issue rules, regulations and orders to prevent waste. Applicants argue that the legislative assembly intended to substitute for the common law remedy an administrative determination of all the issues involved in the present case.

The statute is not that broad. Section 82-11-144, MCA, provides that any interested person who is adversely affected by the Act or by a rule or order of the Board can obtain judicial review. The term "interested person" is broadly defined. The Act provides for restraining orders and injunctions (section 82-11-145, MCA), for an appeal to the Montana Supreme Court (section 82-11-146, MCA), and it allows the Board to bring suit for violations of the Act or of its rules or orders (section 82-11-147, MCA). Section 82-11-142, MCA, provides:

> "This chapter, a suit by or against the board, a violation charged or asserted against a person under this chapter, or a rule or order issued under this chapter does not impair, abridge, or delay a cause of action for damages or other civil remedy which a person may have or assert against a person <u>violating</u> <u>this</u> <u>chapter</u> <u>or</u> <u>a</u> <u>rule</u> <u>or</u> <u>order</u> <u>issued</u> <u>under</u> <u>it</u>." (Emphasis supplied.)

These are the only provisions of the Act that address judicial actions. None of them purports to restrict any of the common law remedies available to private litigants, especially where the common law cause of action would not conflict with a valid rule or order of the Board. On the other

hand, the savings provision contained in section 82-11-142, MCA, applies only to a cause of action against a person "violating this chapter or a rule or order issued under it." This savings clause clearly does not address the common law remedies for implied covenants. In summary then, the 1953 Oil and Gas Conservation Act is silent in respect to common law causes of action.

Section 82-11-201, MCA, allows the Board, in the interest of preventing waste, to establish well spacing units for a pool of oil or gas and to grant exceptions in appropriate cases allowing a well to be drilled outside the location generally authorized by the Board's spacing orders. Furthermore, "[t]he size and the shape of spacing units shall be such as will result in efficient and economic development of the pool as a whole, and the size shall be the area that can be efficiently drained by one well." Section 82-11-201(2), MCA.

There are two ways in which the Board of Oil and Gas Conservation establishes well spacing units. The first is by a statewide spacing order pursuant to ARM §36-3.18(10)-S18040. Such an order is issued on the Board's own motion without the necessity of notice or hearing. The statewide order affects all areas of Montana as to which the Board has not issued a specific spacing order. The second way is by a specific order of the Board upon application of an interested party. A specific order, issued after notice and hearing before the Board, covers a specific area overlying a pool or reservoir of oil or gas.

Prior to September 14, 1972, the spacing of wells drilled on Section 10 was governed by statewide spacing orders issued by the Board of Oil and Gas Conservation. The

-11-

statewide spacing order governing well spacing in the formation and depth to which the Lewis well was drilled, in effect at the time of drilling, provided that one well could be drilled and operated on each quarter section (160 acres). This order was changed by the Board's Order No. 16-71 of May 13, 1971, which provided that one well could be drilled and produced on 320 acres at this depth. Under the May 13, 1971, order, the 320 acre spacing unit would be comprised of two contiguous north-south or east-west quarter sections designated by the lease operator, which did not necessarily have to be within the same section.

On September 14, 1972, the Board of Oil and Gas Conservation held a hearing, at which respondents and applicant U. V. Industries were represented. The Board issued a specific well spacing order superseding the statewide spacing order for the particular production field involved in the present controversy (Lonetree Creek field). This order designated the N1/2 of Section 10 as a production spacing unit. The designated well spacing unit includes the existing, producing Lewis well on the NW1/4 and it also includes the NE1/4 owned by respondents, where they are alleging applicants had a duty to drill an offset well.

In summary, then, the applicable statewide spacing order in effect before May 13, 1971, would allow two wells to be drilled on respondents' property; one on the NE1/4 and one on the SE1/4. After May 13, 1971, and before the Board's specific well spacing order of September 14, 1972, the applicable statewide well spacing order would allow only one well to be drilled on respondents' property, which comprised 320 acres (E1/2 of Section 10).

State laws and the Board's orders and rules are incorporated into oil and gas leases as a matter of law. Armstrong v. High Crest Oils, Inc. (1974), 164 Mont. 187, 520 P.2d 1081, 1084. The Danielson lease itself subjects all of its express and implied covenants to these state provisions. Williams and Meyers, in their treatise Oil and Gas Law (1959), state the following in regard to the effect of conservation laws, and well spacing regulations in particular, on implied covenants: "The suggestion has been made that conservation laws put an end to implied covenants in oil and gas leases. In Mark Twain's phrase, reports of the death are greatly exaggerated." 5 Williams and Meyers, supra, §865 p. 438. Well spacing regulations affect the implied covenant to protect from drainage. A lessee who fails to drill an offset well in violation of a valid well spacing regulation does not breach his duty under the prudent operator standard. 5 Williams and Meyers, supra, §866, p. 440, citing cases from other jurisdictions. This is true even though substantial drainage results. Well spacing regulations do not eliminate the offset drilling covenant, but they override the covenant when the two are in conflict with each other. 5 Williams and Meyers, supra, §866, p. 441, citing cases from other jurisdictions. "If the drilling of an offset well is in opposition to existing rules and regulations of the conservation commission, the implied covenant to prevent drainage is inapplicable." Sullivan, Handbook of Oil and Gas Law, §93, p. 177; §101, p. 191 (1955). Both this rule of law and also the express terms of the Danielson lease relieve the lessee of liability for damages only if he is prevented from performing his obliga-

tions under the lease by such state law, rule or order.

Montana's statutes and case law recognize these principles

in the analogous situation of statutory unitization:

> "Operations conducted pursuant to an order of
> the board providing for unit operations shall
> constitute a fulfillment of all the express or
> implied obligations of each lease or contract
> covering lands in the unit area to the extent
> that the obligations cannot be performed because
> of the order of the board." Section 82-11-
> 211(2), MCA.

See also, Armstrong v. High Crest Oils, Inc., supra.

The relevant question becomes: would the offset well

that respondents claim applicants had a duty to drill to

protect their premises from drainage under the offset drilling

rule be in violation of the Board's well spacing requirements?

"Where an operator could protect against drainage by drilling

a well that would be profitable and would not violate conser-

vation regulations, failure to offset is a breach of covenant."

5 Williams and Meyers, supra, §866, p. 442, citing cases

from other jurisdictions. (Emphasis added.)

Contrary to applicants' contentions, nothing in the

1953 Act or any rule, regulation or order of the Board

prevented the lessee from complying with its implied cove-

nant to drill an offset well. The statewide spacing orders

applicable to the lease during the period of uncompensated

drainage did not restrict applicants' ability to offset the

Lewis well. Applicants were not prevented from drilling an

offset well on the NE1/4 of Section 10 until the specific

well spacing order of September 14, 1972, placed the Lewis

well and the NE1/4 of Section 10 in the same well spacing

unit. Therefore, since it would not be in conflict with any

applicable state law or Board rule, regulation or order, the

implied covenant to drill an offset well was in effect

between the parties to the lease, and respondents have a civil suit for damages as their remedy for applicants' breach of the implied covenant.

The 1953 Oil and Gas Conservation Act provides for the voluntary and involuntary pooling of interests within a spacing unit:

> "When two or more separately owned tracts are embraced within a spacing unit or when there are separately owned interests in all or a part of the spacing unit, then the persons owning those interests may pool their interests for the development and operation of the spacing unit. In the absence of voluntary pooling within the spacing unit, the board, upon the application of an interested person, may enter an order pooling all interests in the spacing unit for the development and operation thereof. The pooling order shall be made after hearing and shall be upon terms and conditions that are just and reasonable and that afford to the owner of each tract or interest in the spacing unit the opportunity to recover or receive without unnecessary expense his just and equitable share of the oil or gas produced and saved from the spacing unit. . ." Section 82-11-202(1), MCA. (Emphasis supplied.)

Section 82-11-201(3), MCA, grants the Board authority to allow exception wells in appropriate situations:

> "Subject to this chapter, the order establishing spacing units shall direct that no more than one well may be drilled and produced from the common source of supply on any spacing unit and that the well shall be drilled at a location authorized by the order, with such exception as may be reasonably necessary where it is shown, upon application, notice, and hearing, and the board finds that the spacing unit is located on the edge of a pool or field and adjacent to a producing unit or, for some other reason, the requirement to drill the well at the authorized location on the spacing unit would be inequitable or unreasonable." (Emphasis supplied.)

Applicants contend that at any time before September 14, 1972, respondents could have, but failed to, apply to the Board for an exception well, or if an exception well would have constituted waste and thus been unlawful, for an involuntary pooling order pooling their interests with those

-15-

of the Lewis well. They argue that the common law offset drilling rule has been superseded by the administrative remedy, on the grounds that the involuntary pooling of interests within a well spacing unit by order of the Board affords the same kind of relief as was formerly granted by the common law judicial remedy of a civil suit for damages in state District Court.

The applicants' argument is faulty for several reasons. First, the Act does not compel respondents to apply to the Board for relief, as the administrative relief is purely optional with an interested person who may apply for it. Second, the administrative remedy of obtaining a permit to drill an offset well was not available to respondents because under the terms of the Danielson lease, as is generally the rule in oil and gas leases, the lessee was given the sole and exclusive right to drill. Rieckoff v. Consolidated Gas Co. (1950), 123 Mont. 555, 217 P.2d 1076, 1081. Respondents themselves consequently had no right under the lease to apply to the Board for a permit to drill an offset well. To the contrary, the applicants had a duty to apply for such a permit if one were necessary under the implied covenant of good faith and fair dealings. Baldwin v. Kubetz (Calif. 1957), 307 P.2d 1005.

A third reason why applicants' argument is unpersuasive is that the Board of Oil and Gas Conservation does not have any authority to adjudicate disputes involving private rights. Pattie v. Oil and Gas Conservation Commission, supra, 402 P.2d at 601, holds that the Board "has the authority and duty to consider correlative rights and private interests in making regulatory orders, but it does not have the authority to adjudicate disputes involving these rights,"

-16-

and that "correlative rights disputes between adjacent landowners must be disposed of by civil action in the District Courts" according to common law principles of oil and gas, citing Sullivan, Handbook of Oil and Gas Law, §141, p. 262 (1955). (Emphasis supplied.) The present case is primarily concerned with respondents' private rights under an implied covenant of the lease as against the applicants as lessees. Correlative rights are peripherally involved here because two of the applicants, U. V. Industries, Inc., and Wolf Corporation, besides being assigns of the lessee, were also owners of interests in the adjacent Lewis lease where the draining well was located. "Correlative rights" were defined in Pattie, 402 P.2d at 599:

> "The term 'correlative rights' has been variously defined to mean those rights of each landowner, lessee, or operator in the common source of petroleum. The rights are limited to corresponding duties to the neighboring operator. The duties are not to take an undue amount of petroleum or to do injury to the common supply. Operation and production is to be carried on only in such manner or amount as not to harm the rights of the others. As it applies in this action, correlative rights would mean the interest of plaintiffs in securing a portion of the natural gas underlying their lease. Their opponent is the Commission rather than an adjacent owner, but the right to share of the common supply is still in issue."

The Pattie case involved oil and gas lessees on adjoining lands. Sumatra had applied to the Board and been granted permission to drill an oil well within lawful spacing limits. The well produced gas instead and was in violation of the well spacing rule for gas. Sumatra applied to the Board for an exception to spacing rule for gas wells. Plaintiffs, who were the lessees on the adjoining lands, also applied to the Board for an exception to drill an offset well to protect their correlative rights. The Board authorized Sumatra's

well as an exception well, but denied plaintiffs' request for permission to drill an offset on the grounds that the Board lacked authority to consider correlative rights. Plaintiffs obtained judicial review of the Board's order in the District Court, which found that the Board had authority to adjudicate correlative rights. The Supreme Court affirmed, modifying the District Court's holding to mean only that the Board had authority to consider correlative rights in issuing its regulatory orders, but that the adjudication of those rights remained in the courts.

The issue in Pattie arose because Montana's 1953 Oil and Gas Conservation Act makes no reference to correlative rights. Reduced to simplest terms, the holding in Pattie is that notwithstanding the absence of any reference to correlative rights in the Act, the legislature intended that the Board consider those rights in issuing its regulatory orders, relying on what is now section 82-11-201(3), MCA. Pattie therefore cannot be cited in support of the argument that the 1953 Act has abolished the common law offset drilling rule. Furthermore, while Pattie may be narrowly construed to apply only to correlative rights, as was the specific holding in the case, it is more reasonable to interpret it broadly to apply to other private interests such as respondents' rights under the covenant implied by the offset drilling rule. In the latter situation, the holding would be support for respondents' position that the Board lacks authority to adjudicate disputes involving rights under the common law implied covenants.

Chevron Oil Co. v. Oil and Gas Conservation Commission (1967), 150 Mont. 351, 435 P.2d 781, adds nothing to the holding in Pattie. In Chevron the Board authorized the

applicants' drilling of an offset exception well but denied
Chevron's request to limit production of the offset well so
as not to violate Chevron's correlative rights, as Chevron
was lessee of the adjacent lands being offset by the excep-
tion well.  Chevron's request for an order limiting produc-
tion from the new offset exception well was denied by the
Board on the grounds that it lacked authority to restrict
production in the absence of a showing of waste.  The Dis-
trict Court sustained this ruling by the Board.  The
Supreme Court reversed, relying on Pattie, and held that the
Board had such authority to protect Chevron's correlative
rights by limiting production from the adjacent exception
well, notwithstanding the absence of a showing of waste.  In
the course of its discussion, the Court said:

> "Just as the Act protects the rights of the owner
> to capture his share of the oil and gas when the
> pool is only under part of his land, it must pro-
> tect the adjoining landowners from having their
> share of the oil and gas appropriated by the
> exeption location well.  To hold otherwise would
> be the equivalent to operating under the Rule of
> Capture theory but without the protection af-
> forded an adjoining landowner under the Off-set
> Drilling Rule theory."  435 P.2d at 784.

Applicants argue that this statement supports their conten-
tion that the Oil and Gas Conservation Act has eliminated
the common law remedy of a civil suit for damages under the
offset drilling rule.  To the contrary, this statement by
the Court merely draws an analogy to make the point that the
Act protects the correlative rights of all parties.  It does
nothing in the way of dispensing with the offset drilling
rule.

The final case relied on by applicants, Armstrong v.
High Crest Oils, Inc. (1974), 164 Mont. 187, 520 P.2d 1081,
says nothing to support their contention that Montana's Oil

-19-

and Gas Conservation Act has eliminated the common law cause of action under the offset drilling rule. High Crest, the assignee of a lease executed by Armstrong's predecessor in interest, applied to the Board and was granted, over Armstrong's protest, an order under the statutory unitization provisions of the Act unitizing a large tract which included the Armstrong lease. Armstrong filed a complaint for judicial review of the Board's order, as provided by the Act, and subsequently, while judicial review was pending, brought an action in another District Court to cancel the lease for breach of a one-well pooling provision in the lease. The Court held that because the same factual arguments and reasons were advanced by Armstrong in the suit for cancellation of the lease as were made in the action for judicial review of the Board's unitization order, the suit for cancellation was an attempt to circumvent the statute by an improper collateral attack on the Board's order. The Board's unitization order was held to be res judicata except in the appropriate District Court on judicial review as provided by what is now section 82-11-144, MCA. Armstrong v. High Crest Oils, Inc., supra, 520 P.2d at 1086.

Applicants in the matter presently certified and before this Court urge that respondents cannot maintain a common law suit under the offset drilling rule because to do so would be a collateral attack upon the Board's order of September 14, 1972, establishing the Lonetree Creek field and special well spacing rules. The argument does not wash. First, respondents are not seeking to circumvent the Act as was the case in Armstrong since there was no decision of the Board to collaterally impeach before the order of September 14, 1972, and no proceeding for judicial review pending.

-20-

Second, respondents' contentions are supported, if anything, by the Board's September 14, 1972 order because the designation of the N1/2 of Section 10 as a well spacing unit tends to establish the fact of drainage alleged by respondents since a well spacing unit is required to be such as will be efficiently drained by one well. Section 82-11-201(2), MCA. Third, respondents are not seeking to do anything that would challenge the validity of the Board's order; their claim relates only to damages for the period before the Board issued its order. Finally, the Court in Armstrong stated: "We agree with respondents' argument that the cancellation of the oil and gas lease may be a separate issue upon which another court may have jurisdiction." 520 P.2d at 1084. In the present situation, the suit for damages for breach of an implied covenant, like a suit for cancellation of the lease, is a separate issue.

Applicants emphasize that the remedy of applying to the Board of Oil and Gas Conservation for an involuntary pooling order was at all pertinent times available to respondents. This relief was available to the respondents under section 82-11-202, MCA. Respondents argue, without citing any authority, that the administrative relief available under the involuntary pooling statute is only available in the event the Board has issued, after notice and hearing, a specific well spacing order, and that it is not available in those areas where only statewide is applicable, as was the case here before September 14, 1972. This argument ignores the fact that respondents had the right, as interested persons, to apply to the Board for a specific well spacing order under section 82-11-201(1), MCA. Although the remedy of applying to the Board for an involuntary pooling order

was available to respondents as an alternate form of relief, it was not, however, their only remedy to the exclusion of the common law offset drilling rule. See the discussion in 5 Williams and Meyers, supra, §866.

Defendants allege plaintiffs waived their right to require defendants to drill an offset well by the acceptance of delay rentals through December 1972. The issue raised in defendants' brief is not one of the issues certified to this Court for a declaratory ruling as to Montana law, and it has not been briefed by plaintiffs-respondents. Therefore, it should not be considered.

In summary of the first issue, the enactment of Montana's Oil and Gas Conservation Act has not, per se, eliminated the common law right of action under the offset drilling rule. An oil and gas lessee still has a duty under the implied covenant to protect his lessor's premises from drainage by drilling an offset well, if doing so would not be in violation of the Act or of a valid rule or order of the Board.

Issue #2. The second issue certified to this Court is whether or not the lessor or her grantees (respondents) was required to serve written notice or demand on the lessee or its assigns (applicants) to drill an offset well; if so, did the lessee have a reasonable time thereafter in which to comply; and when does the obligation of the lessee, if any, to pay damages commence? The offset drilling rule generally requires the lessor or its grantees to serve written notice or demand upon the lessee or its assigns to drill an offset well as a precondition to the latter's duty to drill. Sullivan, Handbook of Oil and Gas Law, §94, p. 180 (1955). The rationale for this rule is explained in Berthelote v. Loy Oil Co., supra, 28 P.2d at 190:

-22-

". . . A usual implied covenant is one against drainage, which is not here involved. The necessity of drilling offset wells is not brought about by the acts of the lessee, but by those of third parties, <u>unless the lessee owns adjoining acreage</u>. Hence, before a breach of an implied covenant could be claimed as substantial, the necessity of protecting the leased premises must be brought home to the lessee in some manner by reasonable notice or demand on the part of the lessor." (Emphasis supplied.)

This quotation, while it illustrates the obligation to give notice, also shows why the obligation is not applicable to two of the applicants in this case. Both U. V. Industries and Wolf Corporation owned an interest in the adjoining acreage and in the Lewis well which was causing the drainage to their lessors, the respondents. Thus, the reason for requiring notice--to bring home to the lessee the necessity of protecting the leased premises--does not apply. The drainage was not brought about by acts of third parties; it was brought about by a well in which U. V. Industries and Wolf Corporation held an interest. Since neither Empire State Oil Co. nor its successor, Ashland Oil Co., ever owned any interest in the Lewis lease, the foregoing reasoning does not apply to them. Plaintiffs-respondents, as the lessor's grantees, were required to give notice before Empire State Oil Co. or Ashland Oil Co. could be charged with a duty to protect the premises from drainage. Since no such notice was ever given, neither Empire State nor Ashland can be held liable for breach of the implied covenant to drill an offset well.

U. V. Industries, Inc. (formerly United States Smelting, Refining and Mining Company), took an assignment of the Lewis lease to the NW1/4 through its predecessor on March 8, 1962. Although U. V. Industries subsequently assigned an undivided one-half of its interest in the lease on January

13, 1970, it retained the remainder of its interest through and beyond the time that the Lewis well was drilled as a producer, February 3, 1970. Thus, it was not necessary for plaintiffs-respondents to give U. V. Industries notice or demand to drill an offset well to protect them from drainage, since U. V. Industries had knowledge of the drainage from the time the Lewis well was completed as a producer.

Wolf Corporation eventually acquired the undivided one-half interest in the Lewis lease that had been assigned to others by U. V. Industries except for a reversionary working interest not important here. This was accomplished by an assignment dated August 13, 1970, some six months after the Lewis well was brought in as a producer. Wolf Corporation thus had notice of drainage to the NW1/4 from at least the time it acquired its interest in the Lewis lease, and it was not necessary for plaintiffs-respondents to demand protection from Wolf Corporation.

Under the reasonably prudent operator standard, the law gives a lessee a reasonable time in which to drill an offset well following either notice or demand by the lessor or its equivalent, acquisition by the lessee of an interest in the adjacent draining lands. 2 Summers Oil and Gas, §412, 414 (1959). Therefore, the obligation to pay damages for failure to offset the producing Lewis well on the adjacent lease dates back to a reasonable time after the lessee had notice of the need to protect the premises from drainage. What constitutes a reasonable time is a question of fact. Summers, supra, §412. Thus, in the case of U. V. Industries, the obligation to pay damages dates from a reasonable time after March 23, 1971, the date that U. V. Industries acquired the entire leasehold interest in the Danielson lease to the E1/2

of Section 10. The reason for this is that U. V. Industries held an interest in the adjacent Lewis lease and in the producing Lewis well, and therefore knew about the drainage and the need to protect the Danielson premises, from the time it was drilled as a producer--February 3, 1970.

On May 15, 1971, the predecessor of U. V. Industries assigned 3/8 of its interest in the Danielson lease to Wolf Corporation and 1/8 to other parties. Wolf Corporation's obligation to pay damages for breach of the implied covenant, therefore, begins a reasonable time after May 15, 1971. The reason for this is that Wolf Corporation held an interest in the adjacent Lewis well, and therefore knew about the drainage and the need to protect the Danielson lease, since August 13, 1970.

The failure of respondents to give notice to Wolf Corporation at any time and their failure to give notice to U. V. Industries before the demand letters dated July 1, 1972 and July 26, 1972, are irrelevant because both had notice of the need to protect respondents from drainage by virtue of their ownership of interests in the adjacent Lewis well which was causing the drainage. These defendants are liable for the covenants maturing while the lease is held by them as assignees. Hergistad v. Hardrock Oil Co. (1935), 101 Mont. 22, 37, 52 P.2d 171.

Issue #3. The Oil and Gas Lease from Hilda Danielson to Empire State Oil Company provides that "[n]o change in the ownership of the land or assignments of rentals or royalties shall be binding on the lessee until after the lessee has been furnished with a written transfer or assignment or a true copy thereof . . ." and the mineral deed from Hilda Danielson to the three plaintiffs-respondents provided

that it was subject to any rights existing in the lessor or its assigns. What is the impact of those provisions on the rights of the parties? The short answer is that they have no effect on the rights arising under the implied covenant here in issue. Defendants argue that because they received no notice of the change of ownership of the mineral estate until they received a copy of the mineral deed from a co-grantee who is not a party to this case on August 2, 1972, plaintiffs cannot assert any rights against them before that date under the terms of the lease.

A "no change in ownership without notice" clause is designed to prevent the lessee's forfeiture of the lease for failure to pay delay rentals to the proper party. Sullivan, supra, §54, p. 115. This clause is valid and is binding on the lessor's grantee. Sullivan, supra, §85. Such a clause has nothing to do with implied covenants, which run with the land and can be enforced by the lessor or its grantees against the lessee and its assigns. 3 Summers, Oil and Gas §553, p. 589 (1958). Additionally, applicants' argument ignores a provision in the lease to this effect:

> "If the estate of either party hereto is assigned or sublet, and the privilege of assigning or sub-letting in whole or in part is expressly allowed, the expressed and implied covenants hereof shall extend to the sub-lessees or assigns, their heirs, executors, administrators and successors . . ."

Plaintiffs were therefore given the right, as mineral grantees, to enforce the implied covenant to protect against drainage and to sue for damages under the terms of the lease. Thus, plaintiffs' failure to give defendants notice of the transfer of ownership before August 1972 does not prevent them from enforcing the implied covenant to protect the land from drainage. To interpret the "no change in ownership without

notice" clause in the manner contended for by the applicants would be to ignore the purpose of the clause.

Issue #4. The final issue is to determine the appropriate statute of limitations. Defendants-applicants contend that this action is barred by Montana's two-year statute of limitations for waste or injury to real or personal property in section 93-2607, R.C.M. 1947 (subsequently amended in 1975, now sections 27-2-207 and 27-2-303, MCA). This is not a correlative rights suit for waste or injury to real or personal property. It is a suit by the grantees of an oil and gas lessor against the lessee and its assigns for breach of an implied covenant to protect from drainage by drilling an offset well. The implied covenant is as much a part of the written lease as the expressed covenants. Bertholote v. Loy Oil Co. (1933), 95 Mont. 434, 28 P.2d 187, 190, citing Brewster v. Lanyon Zinc Co. (8th Cir. 1905), 140 F. 801, 809, stated: "Whatever is implied in a contract is as effectual as what is expressed." The appropriate statute of limitations is therefore eight years, the limitation for actions based on a written contract. Section 27-2-202(1), MCA.

_____
Justice

We concur:

_____
Chief Justice

_____
_____

_____
Justices

-27-