No. 84,076

GEORGE SMITH, Individually, and on Behalf of a Class Composed of all Oil and Gas Royalty Owners Whose Royalty Payments for Natural Gas were Reduced on a per MMBTU Basis Due to Renegotiation, Amendment to or Termination of the Gas Purchase Contract[s] between Amoco Production Company and Williams Natural Gas after the Effective Date of Order 451 Issued by the Federal Energy Regulatory Commission, *Appellants/Cross-appellees*, v. AMOCO PRODUCTION COMPANY, *Appellee/Cross-appellant.*

(31 P.3d 255)

Opinion filed September 21, 2001.

*Lee Thompson,* of Triplett, Woolf & Garretson, L.L.C., of Wichita, argued the cause, and *Gordon Penny,* of Lawrence, was with him on the briefs for appellants/ cross-appellees.

*Richard C. Hite,* of Hite, Fanning & Honeyman, L.L.P., of Wichita, argued the cause, and *Dennis V. Lacey,* of the same firm, *Eric L. Nitcher* and *Tom Winkler,*

of Amoco Production Company of Houston, Texas, *Steven D. Gough*, of Powell, Brewer & Gough, L.L.P., of Wichita, and *Eric B. Smith*, of Brollier & Wolf, of Hugoton, were with him on the briefs for appellee/cross-appellant.

The opinion of the court was delivered by

SIX, J.: This case resolves whether a 3-or 5-year statute of limitations applies to an alleged breach of implied covenants in an oil and gas lease. The actions of defendant Amoco Production Company (Amoco), the producer lessee, under an implied covenant to market in a government-controlled gas price environment are also at issue. Although other jurisdictions have addressed the statute of limitations issue, Kansas has not. Also, we may be the first appellate court to be presented with the type of lessor royalty owner claims asserted here, *i.e.*, breach of the implied covenant to market arising in a factual setting under the Natural Gas Policy Act (NGPA), where the Federal Energy Regulatory Commission's (FERC) Order 451 has been invoked by the lessee.

The class action representative plaintiff, George Smith, and others (either the Smith Class or lessors) are lessors under a minority of natural gas leases held by defendant Amoco in the Kansas Hugoton and Panoma Council Grove fields (Hugoton area). This equitable action for an accounting is based on alleged breaches of the implied covenant to market and the implied duty of good faith and fair dealing, in each lease independently, between Amoco and each lessor.

The lessors claim that from November 1, 1990, through December 31, 1992, Amoco should either have sold all the lessors' natural gas for maximum lawful prices or paid them compensatory royalties. According to the Smith Class, "[a]n equitable accounting was sought to require that Amoco share equitably the economic benefits of the strategic plan it successfully employed at the expense of this class of royalty owners." The difference between maximum lawful prices and the market prices for which the gas was sold would be the basis for computing the royalty owed. The leases called for royalties to be paid on either market value of the gas or proceeds of sale.

In applying K.S.A. 60-512, a 3-year statute of limitations, the district court limited its time frame for viewing Amoco's duty to

act as a prudent operator. In holding that Amoco was a prudent operator, the district court only considered Amoco's actions from August 11, 1990, forward. August 11, 1990, was 3 years from the date this action was filed. The district court held that the lessors failed to prove that Amoco, within the 3-year period, either could have sold the gas for maximum lawful prices or that Amoco could have obtained a greater-than-market price for the gas. The lessors appeal.

·The district court also found that Amoco had an implied duty to obtain the best possible price for gas produced from the lessors' leases and that it had done so. Amoco cross-appeals the best possible price finding.

The issues for review on the lessors' appeal are whether the district court erred in finding that: (1) K.S.A. 60-512, a 3-year statute of limitations, applies and (2) Amoco acted as a prudent operator.

The issue on the cross-appeal is whether the district court erred in concluding that there was an implied duty for Amoco to obtain the best possible price for gas.

We have jurisdiction under our order of transfer. K.S.A. 20-3018(c).

We hold the implied covenants at issue here are implied in fact; thus K.S.A. 60-511, a 5-year limitation statute, applies. Our ruling on the statute of limitations issue expands the window for viewing Amoco's conduct, and, thus, the prudent operator issue will be decided by the finder of fact on remand. The standards for measuring whether Amoco has met its prudent operator duty to the lessors will include the effect of a government-controlled price environment, as more fully discussed in the opinion.

Our statute of limitations ruling also affects the cross-appeal. The district court held that Amoco had marketed at the best possible price. (We have used the phrase "best prices obtainable at the place where the gas was produced." *Maddox v. Gulf Oil Corporation*, 222 Kan. 733, 735, 567 P.2d 1326 [1977], *cert. denied* 434 U.S. 1065 [1978].) On remand the trier of fact, applying K.S.A. 60-511, the 5-year limitations statute, and the rationale of this opinion, will decide if Amoco's activities complied with the standards of

conduct of a prudent operator. The prudent operator standard controls the pricing issue raised by the cross-appeal, as Amoco's implied covenant to market is contained within the duty to act at all times as a reasonably prudent operator.

We reverse and remand.

## FACTS

This case was tried over a 7-day period by experienced counsel before an able judge. The record consists of 59 volumes, over 3,700 pages, plus numerous depositions, and over 200 exhibits. The parties before trial entered into 83 separate written stipulated facts. All of the stipulated facts were incorporated into the findings of the district court. In order to convey the historical background and complexity of the case, we have set out the district court's findings in full. The Smith Class does not challenge any of the findings.

"The following facts are those that the Court considers material to its decision herein, which include the 83 stipulated facts submitted by the parties.

"The Plaintiff in this proceeding is George Smith, both individually and as class representative for all oil and gas royalty owners whose royalty payments for natural gas were reduced on a per MMBtu basis due to renegotiation, amendment to or termination of the gas purchase contracts between Amoco Production Company and Williams Natural Gas Company, Inc., after the effective date of Order 451 issued by the Federal Energy Regulatory Commission (FERC).

"The Defendant, Amoco Production Company, is the lessee of an oil and gas lease in which Smith owns a royalty interest covering a tract of land in Finney County, Kansas. At all times relevant, Amoco produced natural gas from the Smith lease.

"The Hugoton natural gas field covers a large portion of Southwest Kansas and extends into Oklahoma and Texas. The Panoma natural gas field underlies a portion of the Hugoton natural gas field. There are in excess of 5,800 wells in the Kansas portion of this field, which produce approximately 80 percent of all the gas produced in the State of Kansas.

"The predecessor to Amoco and the predecessor to Williams entered into a contract dated June 23rd, 1950, which was amended substantially in 1966, 1971, and 1974. Under the terms of this contract Amoco sold all gas from all of its leases covering approximately 600,000 acres in the Hugoton and Panoma fields to Williams for so long as the leases continued to produce.

"Williams owns a gas line which extends from Grant County, Kansas, to Johnson County, Kansas.

"Also on the same date, the predecessors to Amoco and Williams entered into a gas processing agreement, which allows Amoco to process all gas produced in

areas A and B covered by the 1950 contract through a gas processing plant located in Grant County, Kansas, where Amoco removes liquids from the gas stream prior to committing the gas stream to Williams pipeline for resale by Williams. A third area known as area C of the Amoco field was not processed by Amoco as a result of the 1950 contract.

"One of the additional terms of the 1950 contract was that the predecessor to Amoco sold to the predecessor to Williams the gathering system that it had constructed for area A, and Williams then constructed a gathering system to connect all of Amoco's wells located on the leases in area B of the Hugoton field to Amoco's gas processing plant. A separate gathering system was built by Williams to connect Amoco's leases in area C to another gas processing company.

"The 1974 amendment to the 1950 contract required Williams to purchase gas from Amoco at the highest price authorized by law.

"In 1938, the United States Congress enacted the Natural Gas Act of 1938, which authorized the Federal Power Commission to regulate pipeline rates for transportation and resale of natural gas. At the time of the 1950 contract and until the late 1980's the primary buyers of natural gas were the pipeline companies such as Williams.

"Between 1970 and 1976, various rulings of the FPC established the maximum lawful price for various classes of natural gas being produced in the Hugoton/ Panoma fields.

"After an extremely cold winter of 1976 to 1977, a natural gas shortage began to develop.

"In response, the United States Congress on November 9, 1978, enacted the Natural Gas Policy Act (NGPA) as a part of a national energy policy. The NGPA defined various categories of natural gas and established maximum lawful prices for those classes.

"The NGPA established a higher price for stripper gas and new gas in order to encourage the production of more natural gas in the United States.

"The NGPA established the following classes of natural gas: section 104 old flowing; section 104 biennium; section 104 post-1974; section 103 new onshore; section 108 stripper gas well production.

"The NGPA established the maximum lawful prices for natural gas. The section 108 gas was set at the highest price, the section 103 new onshore was slightly less, the section 104 post-1974 gas slightly lower, the section 104 biennium was lower, and the section 104 old flowing was the lowest in price.

"By early 1984, the NGPA, because of its pricing structure for new gas and stripper gas and because of other parts of the Act, which discouraged several industries from relying on natural gas, had created an abundance of natural gas.

"Because of the increased prices resulting from the passage of NGPA and because of the other natural gas saving aspects of that law, the total sales of Williams was reduced by approximately one-half between 1979 and 1986.

"In late 1985, the Federal Energy Regulatory Commission, predecessor to the FPC, issued Order 436, which gave open access to pipelines and had the effect

of changing a pipeline from a buyer of gas and reseller of the same to a transporter of gas for either a consumer or a producer.

"The effect of this Order 436 on Williams was to reduce by two-thirds Williams' total purchases of gas between 1985 and 1992 because Williams' customers would buy from producers directly.

"In late 1986, Williams attempted to retain customers to purchase its gas at the same time it was dealing with customers and producers to transport gas through its pipelines. Williams attempted to retain its customers by establishing a certain priced gas based on the weighted average cost of gas to its customers, and was able to do this by its purchases of gas in the spot market and purchases of section 104 low cost gas from Amoco, along with rateable purchases of the higher priced gas from Amoco.

"Although Williams controlled the right to purchase all of Amoco's gas under the 1950 contract, Williams also purchased gas from many other suppliers under approximately 1,300 gas purchase contracts from 500 producers in six states. Williams also purchased gas from other interstate pipelines, and it purchased gas not only in Kansas, but also Oklahoma, Texas, Colorado, Wyoming, and Missouri.

"Between late 1987 and early 1988, almost all of the major suppliers of gas to Williams invoked Order 451, and those suppliers thereby effectively terminated whatever purchase contracts they had with Williams.

"FERC Order 451 became effective January 23, 1987. A producer invoked Order 451 by instituting good-faith negotiations and requesting a new price nomination from the purchaser. The purchaser could nominate the maximum lawful price permitted under Order 451, which was the price established for section 104 post-1974 gas, in which case the producer was obligated to continue to sell the gas at that price. If the purchaser nominated a lesser price than the maximum lawful price for section 104 post-1974 gas, the producer had the option of accepting the lower price or rejecting it, and if rejected, the contract was abandoned. If the purchaser refused to set a new price, the contract was abandoned.

"After March of 1988, Williams' only major remaining Hugoton gas purchase contract was the 1950 gas purchase contract with Amoco, under which Williams could purchase up to 300 million cubic feet per day of gas. That 1950 gas purchase contract then represented approximately 95 percent of all of the gas that Williams had under contract in the Hugoton-Panoma gas fields after March of 1988.

"FERC Order 451 had the effect of allowing some producers to obtain the release of gas otherwise dedicated to interstate sales without the voluntary agreement of the purchaser.

"But Order 451 did not have this effect on the Amoco and Williams 1950 contract, because under the terms of that contract Williams was not required to purchase any certain quantity of gas. Williams only had the obligation to take gas from the Amoco leases ratably and ratably as it took gas from other producers in the Hugoton/Panoma fields.

"In the summer of 1986, Amoco and Williams entered into informal negotiations to try to resolve several problems and conflicts that existed between them.

Amoco wanted to increase the price of the section 104 old gas and obtain the release of all of the gas dedicated to the 1950 contract that Williams did not need so that Amoco could sell this gas to other customers. Amoco wanted to own or operate the gathering system so it could make improvements to the system owned by Williams, and thereby sell more gas and to obtain reliable transportation at reasonable rates and to obtain additional processing rights to the gas it produced, that being in area C of the Hugoton field, and to drill and connect infill wells.

"There were additional disputes between Amoco and Williams involving claims under gas purchase contracts in the Moxa and Wamsutter fields in Wyoming and other ongoing litigation and threats of litigation.

"These informal negotiations, starting in the Summer of 1986, continued to June 8 of 1989. Amoco did not invoke the provisions of FERC Order 451 during this period of time because it was afraid that if it did so Williams would nominate the maximum lawful price and shut in the gas field, because pursuant to the 1950 gas purchase contract, Williams was only required to take ratably from the Amoco wells with what it took from other wells in the Hugoton/Panoma gas field.

"These negotiations extending from the Summer of 1986 to 1989 never achieved the goals of either Amoco or Williams.

"On June 8, 1989, Amoco formally exercised its rights under FERC Order 451 as to section 104 old flowing gas produced in the Hugoton field. Within 30 days, Williams invoked Order 451 good-faith negotiations as to section 103 and 108 gas. Williams nominated the maximum lawful price for section 104 flowing gas. Following that, Amoco nominated the maximum lawful price for section 103 and 108 gas.

"The action taken by Amoco had the effect of raising the section 104 old flowing gas from .579 to $2.864, and it increased section 104 recompletion gas from $1.040 to $2.864 and section 104 biennium gas from $1.851 to $2.864.

"The invocation of FERC Order 451 by Amoco did not decrease the price of either section 103 or 108 gas. At the time Williams invoked good-faith negotiation on the section 103 and section 108 gas, the maximum lawful price of section 103 gas was at $3.460 and section 108 gas was at $5.762.

"At this time, in August of 1989, the average market value of gas at the well was $1.20 MMBtu. Between 1989 and 1992, the published actual prices of wellhead gas per MMBtu, the free market price, ranged from $1.29 to $1.42.

"Prior to August of 1989, Williams was able to purchase the section 103 and section 108 gas at its maximum lawful price, which was far above the spot market price of gas, because Williams was able to purchase section 104 gas at approximately two-thirds the market price and blend the cheap section 104 gas it was purchasing with the more expensive section 103 and section 108 gas, thereby being able to hold its total cost of gas down to where it could satisfy its customers' pricing, and thereby sell gas taken from Amoco under the 1950 contract.

"After Amoco invoked Order 451 as to the section 104 gas and raised up its price, and Williams responded by invoking Order 451 as to the 103 and 108 gas, this was no longer possible.

"Williams shut in Amoco's Hugoton/Panoma gas field, taking only minimal amounts of gas each month from each lease.

"Williams could meet its needs on the spot market and did not have to purchase any substantial quantity of gas under the 1950 contract with Amoco.

"Beginning in 1989, 1990, and 1991, through negotiations, Amoco and Williams agreed for the release of increasingly larger amounts of gas from the 1950 contract under temporary agreements.

"The released gas was then sold by Amoco to any consumer it could find at spot market prices from November, 1990, through the end of December, 1992.

"Williams would not release all of the gas that Amoco produced from the terms of 1950 contract because Williams needed the Amoco gas to meet its peak delivery requirements during the Winters of 1990-1991 and 1991-1992.

"After Amoco invoked Order 451 and instituted the good-faith negotiations, the average weighted price of gas to Williams under the 1950 contract increased from $1.29 to $3.24 primarily because of the huge increase in price of the section 104 gas being increased from .58 to $2.86. Williams had access to other gas supplies besides those coming from Amoco where they were able to purchase cheaper gas on the spot market far below the $3.24 price they would have had to have paid Amoco. This was important to Williams in order to maintain its $2.10 weighted average cost of gas to keep its customers.

"During 1989, 1990, and 1991, Williams continued to take gas at peak cold times and one day per month from each lease to prevent cancellation of the lease. For this gas Williams paid prices established by Order 451, and, therefore, Williams continued to pay the maximum lawful price for 103 and 108 gas purchased during this period of time.

"From August, 1989, through the end of 1992, Williams' purchases of gas under the 1950 contract continuously declined each year.

"Commencing in November of 1990, Amoco's production of gas increased dramatically, and they were able to sell all of the gas they produced, excepting only that taken by Williams pursuant to the 1950 contract, at market price under these short-term release agreements.

"In August, 1991, a long-term release agreement, which extended through December of 1992, was entered into between Amoco and Williams. This release agreement did not contain the recall agreements that had been in the prior short-term release agreements.

"Amoco knew that the gas of the Smith Class that was dedicated to the 1950 contract was eligible for section 103 and 108 NGPA prices, which were much higher than the average spot market prices that Amoco could receive for released gas between August, 1990, and December, 1992.

"Prior to obtaining the release of the section 103 and section 108 gas and all other classes of gas from the 1950 contract, Amoco was only selling very small volumes at the regulated price because Williams was only taking a very small amount of gas from the Amoco wells in order to hold its position under the 1950 contract.

"There was no market in the free market for any gas priced at the maximum lawful price of section 103 and section 108 gas between August, 1990, and December 31, 1992. It was simply too high for anyone to pay when there was an abundance of cheaper gas in the market place.

"The United States Government, through the Wellhead Decontrol Act, which took all price regulations off of natural gas as of December 31, 1992, as well as FERC Orders 436 and 451, intended to create a free market to determine the price of natural gas.

"The invocation of Order 451 by Amoco in June of 1989 and the negotiated releases of gas from the 1950 contract in the years 1990 through the end of 1992 allowed Amoco to use the released gas sales to develop a customer base because the future was certain that Williams would not be the only customer of Amoco in the coming years."

## DISCUSSION

### Proceedings Below

This action, filed in Finney County on August 11, 1993, was consolidated with *Youngren v. Amoco*, Case No. 89 CV 22, and transferred to Stevens County. In *Youngren*, royalty owners with leases in the Hugoton area whose old gas sold for the low maximum lawful prices sued Amoco for failing to invoke Order 451 sooner (to increase the price of gas produced by their leases). *Youngren* was settled.

This case went to trial. The sales in question were those released from the 1950 contract occurring from November 1990 through December 1992. Amoco invoked Order 451 in 1989. The district court, on June 2, 1998, in denying both Amoco's and the lessors' motions for summary judgment focused on unresolved fact questions saying:

"Whether or not [Amoco] was acting as a prudent operator when it entered into agreements for the sale of the released gas in 1990, '91 and '92 at the prevailing market prices begs the question as to whether or not it was acting as a prudent operator when it chose to exercise its rights to invoke Order 451. *That is the key question of fact that must be resolved by the trier of fact in this proceeding*." (Emphasis added.) (Denying Amoco's motion.)

"At the heart of the Plaintiffs' case this Court believes that *there is a question of fact that is unresolved as to whether or not the Defendant was using the negotiating provisions of the FERC Order 451 to obtain a financial benefit for the Defendant, to the detriment of these Plaintiffs*. It is uncontroverted that the Defendant herein entered into the good-faith negotiations with William Natural Gas

and [was] *aware of the impact of those negotiations upon the Smith Class 'new' gas prices."* (Emphasis added.) (Denying the lessors' motion.)

Amoco later filed a second motion for summary judgment based on the statute of limitations. The district court, in June 1999, relying on *Zenda Grain & Supply Co. v. Farmland Industries, Inc.*, 20 Kan. App. 2d 728, 894 P.2d 881 (1995), granted the motion in part, applying K.S.A. 60-512, a 3-year statute of limitation, to the lessors' claims. *Zenda Grain* is not an oil and gas case. The district court ruled that the implied covenants in the lessors' leases were covenants implied in law, not in fact, and, thus, a 3-year statute of limitation applied. The district court understandably had difficulty in resolving this Kansas first-impression issue. In the journal entry for partial summary judgment the district judge said:

"There seems to this Court to be an inherent inconsistency created when an arbitrary time limit is imposed upon an artificial cause of action which was created to promote justice.

"Nevertheless, trial courts must be bound by appellate court precedence or chaos results. *This Court has spent too much time trying to find some precedent other than Zenda Grain and is bothered by the result of an arbitrary time limit imposed on a cause of action created to promote fairness and justice, but is bound by Zenda Grain, nevertheless.*

. . . .

"Relying upon the authority of *Zenda Grain v. Farmland Industries*, this Court finds that the implied covenants to deal fairly, to market gas, and to obtain the best price possible can only be imposed by operation of law and are clearly implied obligations within the lease agreement, which have a three-year statute of limitations.

". . . Plaintiffs are entitled to pursue claims against Amoco for all breaches and damages occurring on or after August 11, 1990." (Emphasis added.)

## The District Court's Ruling at Trial

During the bench trial the district court was presented with deposition testimony, documentary evidence, stipulations, and live testimony from witnesses, including expert testimony for both sides. It concluded that Amoco had an implied duty to obtain the best possible price for gas produced from its leases and that Amoco had fulfilled that duty. Applying K.S.A. 60-512(1), the 3-year limitation statute, the district court found "that in all regards to the Smith Class royalty owners Amoco did act as a prudent operator *because*

*between August 11, 1990, and December 31, 1992,* Amoco did the best thing it could possibly do for the Smith Class royalty owners." (Emphasis added.) The district court also found that the lessors failed to prove that Amoco: (1) could have obtained a greater price for the sales of released gas; (2) could have sold the lessors' gas for the NGPA maximum lawful price; or (3) breached an implied covenant of fair dealing.

### The Statute of Limitations

The district court said that if the 5-year statute of limitations applied, the damages resulting from breach of lease agreements would be limited to the 5 years preceding the date the action was filed, August 11, 1993. If the 3-year statute of limitations applied, "the resulting damages occurring from and after August 11, 1990, the preceding three years, would be at issue." The district court concluded that the lessors were entitled to pursue claims against Amoco for "all breaches and damages occurring on or after August 11, 1990." Lessors sought no accounting for sales after December 31, 1992, because gas prices were deregulated after that time.

The lessors contend that the district court erred by keying on the date, August 11, 1990, (3 years from the filing of the claim) to define the substantive nature of the case, rather than as a procedural rule to decide if the action was filed in a timely manner after it had accrued. Because of our holding that K.S.A. 60-511, the 5-year statute, applies, resolution of the parties' debate on whether the district court confused a statute of limitations with a statute of repose is neither pivotal nor required.

The lessors' equitable action arises out of an alleged breach of implied covenants and duties. Amoco's intent, conduct, and motives that occurred before, during, and after August 11, 1990, to December 31, 1992, are relevant in determining whether a breach of implied covenants occurred.

Excerpts from the journal entry of decision mirror the significance placed by the district court on the date of August 11, 1990.

"To this Court what makes Amoco a prudent operator is confined to the issues in this case and the acts that Amoco did between *August 11, 1990,* and December 30, 1992.

"[B]etween *August 11, 1990,* and December 31, 1992, Amoco did the best thing it could possibly do for the Smith Class royalty owners.

". . . Plaintiffs have failed to prove that any action done by Amoco between *August, 1990,* and December, 1992, breached the duty to deal fairly and honestly with the Smith Class." (Emphasis added.)

The lessors, having filed their action in time, were entitled to prove their claim by advancing admissible evidence of the Amoco-lessor relationship before or after August 11, 1990. In fact, the district court focused on Amoco's negotiating the provisions of FERC Order 451 and invoking 451 in 1989 as the unresolved questions of fact requiring denial of both parties' 1998 summary judgment motions.

We next take up the 3-year/5-year statute of limitation controversy. The lessors contend that the district court's finding conflicts with the well-settled rule that an action upon implied covenants in a written oil and gas lease is an action governed by a 5-year statute of limitations. See K.S.A. 60-511(1). According to the lessors, the lease covenants here are implied in fact, not in law, and are, thus, an integral part of the written lease. We agree.

This issue involves a question of law, over which we have unlimited review. *Gillespie v. Seymour,* 250 Kan. 123, Syl. ¶ 2, 823 P.2d 782 (1991).

K.S.A. 60-511(1) says:

"The following actions shall be brought within five (5) years: (1) An action upon any agreement, contract or promise in writing."

K.S.A. 60-512(1) says:

"The following actions shall be brought within three (3) years: (1) All actions upon contracts, obligations or liabilities expressed or implied but not in writing."

We identify the unique character of oil and gas jurisprudence as the cardinal thread in our analysis of the statute of limitations question. Implied covenants in oil and gas leases and government regulation of the gas industry have historically been litigated, discussed in texts, and debated by scholars. One result has been the development of a body of law that recognizes implied covenants in an oil and gas lease as either implied in fact or implied in law. In

reality there appears to be no clearly established or uniformly applied basis in the law for distinguishing between the two concepts. See 5 Kuntz, A Treatise on the Law of Oil & Gas § 54.3(b) (1978).

The district court relied on *Zenda Grain*, 20 Kan. App. 2d 728, advanced below by Amoco, in reasoning that the 3-year statute of limitations applies here. We disagree. The implied warranty there was for management services to be performed in a workman-like manner in managing a farmers cooperative. For a discussion of implied covenants in oil and gas leases see Martin, *Implied Covenants in Oil and Gas Leases -Past, Present & Future*, 33 Washburn L. J. 639 (1994); Cohen, *Implied Covenants in Kansas Oil and Gas Leases*, 9 Kan. L. Rev. 7 (1960).

A contract implied in fact is one "inferred from the facts and circumstances of the case" but which is "not formally or explicitly stated in words." *Atchison County Farmers Union Co-op Ass'n v. Turnbull*, 241 Kan. 357, 363, 736 P.2d 917 (1987). It is the product of agreement, although it is not expressed in words. *In re Marriage of Wageman*, 25 Kan. App. 2d 682, 687, 968 P.2d 1114 (1998). See *Degnan v. Young Bros. Cattle Co.*, 152 Kan. 250, 254-55, 103 P.2d 918 (1940). A contract implied in law does not rest on actual agreement. It is a legal fiction created by the courts to ensure justice or to prevent unjust enrichment. See *Mai v. Youtsey*, 231 Kan. 419, 422, 646 P.2d 475 (1982).

Commentator Roger C. Cohen agrees with the lessors here that *Mills v. Hartz*, 77 Kan. 218, 94 Pac. 142 (1908), supports the proposition that implied covenants in oil and gas leases are implied in fact. 9 Kan. L. Rev. at 7. *Mills* involved an action to cancel an oil, gas, and coal lease for failure to explore and properly operate. We held that a lessee has a duty to explore and develop the lease. We noted that in *Maxwell v. Todd*, 112 N.C. 677, 16 S.E. 926 (1893), the lease contained no stipulation of forfeiture resulting from the failure to explore or work the mines. The *Maxwell* court held that " 'the law will construe the contract as if such a stipulation had been expressly written therein, and will adjudge such lease to be forfeited if, within a reasonable time, the lessee fails to carry out the purpose of the lease.' " *Mills*, 77 Kan. at 222. We found that Mills' protracted delay and the failure to act on the things contem-

plated by the lease was the equivalent to a surrender and the lessor had the right to treat the contract as abandoned. 77 Kan. at 223.

The lessors also rely on *Gillet v. Investment Co.*, 111 Kan. 755, 756-57, 207 Pac. 843 (1922). In *Gillet*, an oil and gas case, we allowed plaintiffs with express covenants and plaintiffs with implied covenants to be joined in the same action.

The lessors also direct us to oil and gas lease cases involving statute of limitation issues from other jurisdictions. In *Texas Pacific Coal & Oil Co. v. Stuard*, 7 S.W.2d 878 (Tex. Civ. App. 1928), the lessee argued that the implied covenant to develop the premises required the application of a 2-year statute of limitations because it was not in writing. The *Texas Pacific* court noted that, upon accepting the lease, Texas law imposed a duty to develop the premises diligently if the oil and gas could be developed profitably to Stuard. The obligation "was in the minds of the parties and became a part of the written contract." 7 S.W.2d at 881. *Texas Pacific* concluded that the implication to develop was part of the contract and, therefore, was governed by the 4-year statute of limitations, rather than the 2-year statute of limitations. 7 S.W.2d at 882. See also *Danciger Oil & Ref. Co. v. Powell*, 137 Tex. 484, 490-92, 154 S.W.2d 632 (1941) (noting that covenants will be implied in fact when necessary to give effect to the actual intention of the parties, as reflected by the contract, and also concluding that there was no implied covenant to develop the property for oil and gas mining purposes).

*Indian Terr. Illuminating Oil Co. v. Rosamond*, 190 Okla. 46, 50-51, 120 P.2d 349 (1941), held that an implied covenant of an oil and gas lease was subject to a written contract 5-year statute of limitations rather than the 3-year statute for actions upon contracts not in writing. The court noted: " 'A covenant arising by necessary implication is as much a part of the contract—is as effectually one of its terms—as if it had been plainly expressed.' " 190 Okla. at 50. *Indian Territory* concluded that the implied covenant to protect against drainage was a part of the written lease as if it had been expressly listed in the lease. 190 Okla. at 50. See also *Sundheim v. Reef Oil Corporation*, 247 Mont. 244, 806 P.2d 503 (1991) (the parties agreed that the 8-year statute of limitations relating to

written contracts applied to the covenants arising out of an oil and gas lease); *U.V. Industries, Inc. v. Danielson*, 184 Mont. 203, 228, 602 P.2d 571 (1979) (finding that implied covenant to protect from drainage by drilling an offset well was governed by the 8-year statute of limitations relating to written contracts). Amoco does not mention *Texas Pacific, Danciger Oil, Indian Terr., Sundheim*, or *Danielson* in its arguments on appeal.

In addition to *Zenda Grain*, Amoco relies on other non-oil and gas cases to support its implied in law argument. See *Turner and Boisseau v. Nationwide Mut. Ins. Co.*, 944 F. Supp. 842, 846 (D. Kan. 1996) (because written contract made no reference to fees and expenses, "any agreement . . . to charge reasonable and appropriate fees would have had to have been either an implied or oral agreement, and thus subject to the three-year statute of limitations"); *Miller v. William A. Smith Constructing Co.*, 226 Kan. 172, Syl. ¶ 1, 603 P.2d 602 (1979) (for written agreement to fall within 5-year statute of limitations, it "must contain all its material terms in writing"); *Belger Cartage Serv., Inc. v. Holland Constr. Co.*, 224 Kan. 320, 332-34, 582 P.2d 1111 (1978) (3-year statute of limitations applied to claim based on implied warranty to complete a job in workmanlike manner, notwithstanding existence of written contract); *Chilson v. Capital Bank of Miami*, 10 Kan. App. 2d 111, 113-15, 692 P.2d 406 (1984), *aff'd* 237 Kan. 442, 701 P.2d 903 (1985) (stamp on back of check did not constitute written guarantee; guarantee implied by UCC and 3-year statute controls); *Ware v. Christenberry*, 7 Kan. App. 2d 1, 4, 637 P.2d 452 (1981) (action sounding in contract for breach of implied warranty governed by 3-year statute of limitations). These cases are not persuasive here.

Amoco also advances *Waechter v. Amoco Production Co.*, 217 Kan. 489, 537 P.2d 228 (1975), *aff'd on reh.* 219 Kan. 41, 546 P.2d 1320 (1976), and *Lightcap v. Mobile Oil Corporation*, 221 Kan. 448, 463, 562 P.2d 1 (1977), *cert. denied* 434 U.S. 876 (1977), both oil and gas cases, to support its contention that the implied covenants in the leases here are implied in law, not in fact, and, thus, subject to K.S.A. 60-512(1), the 3-year statute.

In *Waechter* we held that in spite of the existence of a written oil and gas lease, claims to recover mistaken overpayment of royalties were based on a theory of implied contract. Thus, the claims were subject to the 3-year statute of limitations. In determining which statute of limitations applied, we noted:

" 'Although a written contract was in existence between the lessor and the lessee and another between the lessee and the distributor of the gas, the amounts here claimed are not due under either contract. The sole basis for recovery must be found in a contract implied in law requiring a person who has been *unjustly enriched* at the expense of another to make restitution.' [Citation omitted.]" (Emphasis added.) 217 Kan. at 516.

In *Lightcap*, we again applied the 3-year statute of limitations to a claim regarding the overpayment of royalties under a theory of unjust enrichment. 221 Kan. at 463.

As Amoco points out, all commentators in oil and gas law do not agree on the question of whether implied covenants in oil and gas leases are integral parts of the written contract and, thus, implied in fact.

We next take up a review of text authorities.

"The question is sometimes discussed, though seldom litigated, whether covenants are implied 'in fact' or 'in law.' Eminent authorities have disagreed: Mr. A.W. Walker, Jr., believes that covenants are implied in fact; Professor Maurice Merrill believes very firmly they are implied in law." 5 Williams & Meyers, Oil & Gas Law § 803, p. 17 (2000).

Williams and Meyers conclude that there is a large element of truth on both sides of the controversy. They opine:

"A covenant is implied in fact when its existence is derived from the written agreement and the circumstances surrounding its execution. A covenant is implied in law when it is added to the contract by a court to promote fairness, justice and equity." 5 Williams & Meyers § 803, p. 18.

They ask:

"Does it make any difference whether covenants are implied in fact or in law? Judging from the reported cases, the answer seems to be, not often and not much. The decisions disclose three consequences that may depend upon the distinction.

"First, the statute of limitations applicable to an action for breach of implied covenant may be determined by the classification of the covenant as implied in fact or in law. Two cases in point hold the covenant to be implied in fact

and give the lessee the benefit of the longer period of limitation applicable to written contracts [citing *Indian Territory* (Oklahoma) and *Stuard* (Texas)]. Both reject the contention that since covenants are implied by courts to accomplish justice and are not part of the contract made by the parties the shorter limitation period applicable to contracts not in writing should govern implied covenants.

"Second, it is said that the continued liability of the original lessee, after his assignment of the lease, depends upon whether the covenants in the lease are implied in fact or in law. If implied in fact, the lessee remains liable; if implied in law, he does not, since liability is predicated on a relationship that has terminated. Here, again, the cases seem to adopt the position that the covenant is implied in fact, and hence the lessee remains liable for performance of the covenant [citing *Gillet*, 111 Kan. 755 (1922)].

. . . .

"In summary, wherever it has mattered, the courts have declared covenants *to be implied in fact* and have invoked the consequences that follow from such classification." (Emphasis added.) 5 Williams & Meyers § 803, pp. 18-19.

## Williams & Meyers critique the issue this way:

"One may wonder why all the sound and fury about the question of implication 'in law' or 'in fact' when the consequences seem so minor and the authorities so uniformly in favor of implication in fact. We suspect that the disagreement is more than academic shadowboxing." 5 Williams & Meyers § 803, p. 19.

## Another text writer, Eugene Kuntz, says:

"Although there is no clearly recognized and uniformly applied basis for making a classification of things implied in law and things implied in fact in other areas of the law, the term 'implied in law' is a better description of the nature of covenants implied in oil and gas leases.

. . . .

"In the few cases decided on the subject in which a classification of implied covenants was material, most of the deliberate expressions on the subject are *to the effect that the implied covenants are implied in fact*. The cases in which such classification was material involved *the statute of limitations*, the parol evidence rule, venue, and the liability of a lessee on the covenants after an assignment of the lease.

"In those instances in which the court has been called upon to determine which *statute of limitations should be applied* to actions on the implied covenants, *it has been held that the statute governing the bringing of actions on written contracts is applicable*." (Emphasis added.) 5 Kuntz, A Treatise on the Law of Oil and Gas § 54.3(b), pp. 9-10 (1978).

## Kuntz also comments on *Gillet*, 111 Kan. 755:

"It has been held that the original lessee does remain liable on the covenants of full development and protection against drainage after assigning the lease. In the case so holding, the court disposed of the question by saying that the original lessee remained liable on the covenants, 'because he made them.' Merrill would have held otherwise." 5 Kuntz § 54.3(b), p. 12.

Professor Merrill is the advocate for the implied in law approach. See Merrill, The Law Relating to Covenants Implied in Oil and Gas Leases § 220 (2d ed. 1940).

Kuntz concludes:

"Basically, the result of the decisions is that implied covenants are to be treated as a part of the written instrument." 5 Kuntz § 54.3(b), p. 13.

Professor David E. Pierce believes that in Kansas, implied lease covenants are "implied in fact," explaining that "implied lease covenants, being implied in *fact*, are limited by the express terms of the lease agreement and the intent of the parties as reflected by the nature and purpose of the leasing transaction." 1 Pierce, Kansas Oil and Gas Handbook § 10.01, pp. 10-4 to 10-5 (1989).

According to Professor Richard W. Hemingway:

"There is much to be said for the implied-in-law approach championed by Professor Merrill. Although courts state that they are effectuating the intent of the parties, seldom is an actual inquiry to intent reported. . . .

"Controversy also exists as to whether the covenants are implied in law or in fact. If the former, they do not constitute part of the contract itself. If the latter, they are considered as being part of the contract and are subject to the same laws affecting limitations, venue, etc., as the written lease. *It appears that the majority view is that implied covenants are implied in fact and not in law.*" (Emphasis added.) Hemingway, The Law of Oil & Gas § 8.1, p. 543 (3d ed. 1991).

Hemingway leads off his recitation of authorities supporting the implied in fact view with a Kansas case, *Gillet.* Hemingway § 8.1, p. 543.

The *Indian Territory* court observed in 1941 that it had found no support for Professor Merrill's implied in law doctrine in the adjudicated cases. 190 Okla. at 50. Sixty years later, based on the briefing here, we share the same observation. We choose to join Oklahoma, Texas, and Montana in holding that the covenants are implied in fact. Our holding follows the early development of oil and gas law in Kansas. See *Brewster v. Lanyon Zinc Co.,* 140 F.

801 (8th Cir. 1905) (involving a Kansas oil and gas case removed to federal court from the district court of Allen County); *Howerton v. Gas Co.*, 81 Kan. 553, 106 Pac. 47 (1910). For a discussion of *Brewster*, see *Kansas Baptist Convention v. Mesa Operating Limited Partnership*, 253 Kan. 717, 726-28, 864 P.2d 204 (1993).

K.S.A. 60-511 will control on remand.

## The Cross-Appeal

The district court found that Amoco had an implied duty to obtain the best possible price for gas produced from the Smith Class leases. Amoco cross-appeals arguing that, under the express provisions of the leases, it merely had a duty to pay royalties based upon either the market value of the gas or on the proceeds of the sale of the gas. In effect, Amoco argues that the royalty clauses of the leases determine the level of price it has the duty to obtain. According to Amoco, the district court has imposed "a new ill-defined standard requiring perfection from producers in a gas market that fluctuates greatly."

The members of the Smith Class are lessors in a total of 1,439 leases. Of those leases 1,236 are *"Waechter"* leases (the type considered in *Waechter*, 217 Kan. 489); 128 of the leases are "proceeds" leases; 50 of the leases are "market value" leases; and the remaining 25 leases are other types of leases.

*Waechter* leases provide that the "lessee shall pay lessor monthly as royalty on gas marketed from each well one-eighth of the proceeds if sold at the well, or, if marketed off the leased premises, then one-eighth of the market value at the well." *Waechter*, 217 Kan. at 489, Syl. ¶ 2. The language of the proceeds leases is not always identical, but the operative language relating to payment of royalties is that the lessee shall pay lessor a share of the actual monies received from the sale of the gas. Under market value leases, royalties are to be computed upon the price that would be paid by a willing buyer to a willing seller in a free market, based upon the arbitrated price. See *Matzen v. Cities Service Oil Co.*, 233 Kan. 846, 851, 667 P.2d 337 (1983).

The district court's conclusion that Amoco had a duty to obtain the best possible price did not affect the outcome below because

of the finding that Amoco did, in fact, obtain the best possible price. However, Amoco challenges the finding as "contrary to long-standing precedent" and suggests it "would impose an unrealistic burden on gas producers."

Amoco relies on *Waechter*, 217 Kan. 489, Syl. ¶ 2, and *Lightcap*, 221 Kan. 448, 457-58. The Smith Class counters by looking to Justice Fromme's observation in his *Lightcap* concurring and dissenting opinion that the lessee fulfilled its duties "in obtaining the best price available for the gas produced." 221 Kan. at 488. For a discussion of *Waechter* and *Lightcap*, see Larson, *Survey of Kansas Law: Oil & Gas*, 27 Kan. L. Rev. 277 (1979).

The Smith Class observes that *Waechter* noted that the record revealed that Amoco had made sustained efforts to secure a higher price. There was "nothing to suggest it did not use the utmost diligence to obtain the best price possible." 217 Kan. at 511. Justice Schroeder observed in his *Waechter* dissent that Kansas law imposes an implied duty upon the lessee to exercise the diligence of a prudent operator, having due regard for the interests of both the lessor and the lessee, "to obtain a market for the gas at the best price obtainable." However, the authorities cited to support this proposition are from Oklahoma. 217 Kan. at 533-34.

In *Maddox v. Gulf Oil Corp.*, 222 Kan. 733, 735, 567 P.2d 1326 (1977), *cert. denied* 434 U.S. 1065 (1978), a successful class action suit by lessors to recover interest on suspense royalties, we said: "It was the duty of Gulf under the lease contracts it had with its royalty owners to market the gas at the best prices obtainable at the place where the gas was produced."

Amoco also relies on *Holmes v. Kewanee Oil Co.*, 233 Kan. 544, 664 P.2d 1335 (1983), *cert. denied* 474 U.S. 953 (1985), and *Matzen*, 233 Kan. 846. In *Holmes*, again, lessors claimed that under market value leases, they were entitled to royalties based on market value prices that were higher than the prices for which gas was sold under a gas purchase contract. We found that the "[m]arket value of gas is that price which would be paid by a willing buyer to a willing seller in a free market." 233 Kan. at 544, Syl. ¶ 5. We upheld a judgment awarding the lessors royalties on the higher market

value with respect to gas sold through the date of the trial. 233 Kan. at 551-53.

In *Matzen* we reaffirmed *Waechter* and *Lightcap* and adopted the interpretations of market value and proceeds set forth in *Lightcap*. A major question left undecided by *Lightcap* was: "How is the free market value of natural gas to be determined in a highly regulated interstate market?" *Matzen*, 233 Kan. at 852. *Matzen* affirmed the district court's finding that the realistic guide to market value was the maximum Federal Power Commission (FPC) regulated price, a price at which gas was actually being sold from the Hugoton field. 233 Kan. at 853, 860.

Amoco argues that the district court here imposed a much higher and unrealistic standard. According to Amoco, under *Waechter*, *Lightcap*, *Holmes*, and *Matzen*, royalty owners under a proceeds lease are merely entitled to a share of money received from the actual sales of gas; royalty owners under a market value lease are merely entitled to a share of the market value which is determined by what a willing buyer would pay to a willing seller in a free market.

The Smith Class correctly points out that in oil and gas leases, lessees are bound by the covenant to market gas. See *Robbins v. Chevron U.S.A., Inc.*, 246 Kan. 125, 134, 785 P.2d 1010 (1990). The nature of the duty is that "[o]nce oil or gas is discovered in paying quantities, the lessee has an implied obligation to produce and market production diligently." 246 Kan. at 131. The lessors assert that one component of the lessee's required diligence is the attendant duty to obtain the best price in gas contracting. See Kramer & Pearson, *The Implied Marketing Covenant in Oil and Gas Leases: Some Needed Changes for the 80's*, 46 La. L. Rev. 787, 812 n. 151 (1986) (citing the Schroeder, J. dissent in *Waechter* as Kansas authority). According to the Smith Class, Amoco should not have sought relief from the 1950 contract in the first place. However, because Amoco did, it should be held to account for the economic impact of its conduct.

The Smith Class looks to *Watts v. Atlantic Richfield Co.*, 115 F.3d 785 (10th Cir. 1997). *Watts* is a diversity summary judgment case involving claims by lessors against their lessee. The *Watts* les-

sors asserted that *Atlantic Richfield* (ARCO) failed: (1) to pay proceeds received in a settlement with its gas purchaser, (2) to obtain the highest price available for the lessors' gas, and (3) to protect the lessors' units against drainage. ARCO had sued its purchaser Arkla for $279 million in a state court breach of contract action, claiming Arkla was obligated to pay the highest lawful price for NGPA § 103 gas. The litigation was settled. The lessors claimed royalties from ARCO on the settlement proceeds. The Tenth Circuit reversed on summary judgment, observing that ARCO's decision to settle may have been prudent. However, the court, looking to Oklahoma oil and gas law, could not say as a matter of law that ARCO satisfied the implied covenant to market. 115 F.3d at 795. ARCO agreed with its purchaser to accept a price for gas lower than the price ARCO should have received under its gas supply contract. A genuine issue of material fact remained, particularly in view of ARCO's conflicting positions. ARCO alleged that Arkla, its purchaser in the state court action, was obligated to pay the NGPA § 103 price for the lessors' gas. Order 451 was not involved in *Watts*. We are dealing with a different factual setting here.

Amoco acknowledges that it had an obligation to act in good faith and to deal fairly with the Smith Class. The district court found that the lessors failed to prove that Amoco breached this obligation. Amoco asserts, however, that the Smith Class attempts to erroneously apply the obligation to unambiguous express provisions in the leases. See *Havens v. Safeway Stores*, 235 Kan. 226, Syl. ¶ 2, 678 P.2d 625 (1984) (saying that it is not for the court to reform an instrument by rejecting words of clear and definite meaning). It argues that the Smith Class asks the court to erroneously substitute a provision (duty to obtain the best possible price) for an existing unambiguous provision in the contract.

Amoco, recognizing the "scarcity of authority" in this area, cites *Schroeder v. Terra Energy*, 223 Mich. App. 176, 194, 565 N.W.2d 887 (1997), to support its contention that it had no duty to obtain the best possible price. The *Terra Energy* court found that an implied covenant to market did not require the lessee to obtain the "best available market price" because the royalty clause expressly required that the lessee only obtain the "prevailing market rate."

223 Mich. App. at 194. In *Terra Energy*, the principal issue was whether "gross proceeds at the wellhead" contemplated deduction of post-production costs from the sales price of the gas. (The answer was yes.) *Terra Energy* did not find under Michigan law a lessee's requirement to obtain the best market rate. 223 Mich. App. at 181, 194-95. Although instructional, *Terra Energy* is not persuasive in this jurisdiction.

Amoco argues that in *Matzen*, 233 Kan. 846, we rejected the standard adopted by the district court. However, *Matzen* is not as clear on the issue as Amoco suggests. *Matzen* recognized that the market is affected by "pervasive regulation" in focusing on whether market value may be higher than the contract price for purposes of calculating royalties in market value leases. See 233 Kan. at 857.

The Smith Class contends that it is illogical to say that the expressed royalty provisions override the lessee's implied duties. They reason that setting aside a duty to obtain the best price possible eliminates the duty of good faith and fair dealing and the implied covenant to market. They suggest that the marketing duty arises in any lease in which royalties are paid in kind or based on the value of a fraction of the mineral produced or even on the payment of a fixed sum of money, citing 5 Williams & Meyers, Oil and Gas Law § 853, pp. 390.4-390.5. See also *Kansas Baptist Convention*, 253 Kan. at 724-26 (applying implied obligation of good faith in oil and gas lease). They advance the argument by asserting that: (1) they are "royalty owners whose leases qualified in 1989 for maximum lawful prices enacted to encourage production of their reserves," and (2) Amoco had a duty of good faith and fair dealing to maintain the artificially high NGPA prices, "the best price available, for their gas," by continuing royalty payments under the 1950 contract. The district court appears to have concluded that Amoco had a duty to obtain not the *best* price, but the best price *possible*, or stated another way, the best available price.

We have reversed and remanded on the statute of limitations issue. On remand the best possible price (best available price) issue raised by Amoco in its cross-appeal may again be present. Our difficulty in resolving the cross-appeal with a simple up or down pronouncement like, "yes" Amoco has, or "no" Amoco has not

breached its implied marketing covenant here, is influenced by four observations. First, on Amoco's concern that the district court's ruling "would impose an unrealistic burden on gas producers," we do not attempt here to resolve future litigation that may arise from different circumstances under implied and express covenants in oil and gas leases. Second, none of the authorities cited by the parties arose in a FERC Order 451 scenario. Third, the district court's description of a breach of an oil and gas lease for failure to market at the "best possible price" is couched in terms of a producer "intentionally" selling gas "below the best possible price that could be obtained." Fourth, none of the Kansas cases cited dealt with a "head to head" contest between a best possible price claim under an implied covenant and express marketing provisions of oil and gas leases.

This is a complex case with an 8-year litigation history. Kansas has always recognized the duty of a lessee under an oil and gas lease to use reasonable diligence in finding a market for the product or run the risk of causing the lease to lapse. *Gilmore v. Superior Oil Co.*, 192 Kan. 388, 392, 388 P.2d 602 (1964).

In *Robbins*, 246 Kan. 125, we dealt with the implied covenant to market. We noted that the lessee has an obligation to market the produced minerals at reasonable terms within a reasonable time following production. We reversed summary judgment for the *Robbins* lessors and remanded. We said that a lessee's activities are measured by the standard of a reasonably prudent operator and judged on the circumstances existing at the time of the alleged breach. The question of compliance with this standard is primarily a question of fact. 246 Kan. at 131, 133. We quoted the rule by which a lessee's performance is measured.

" 'In absence of a controlling stipulation, neither the lessor nor the lessee is the sole arbiter of the extent, or the diligence with which, the operations and development shall proceed. The standard by which both are bound is what an experienced operator of ordinary prudence would do under the same or similar circumstances, having due regard for the interests of both.' " 246 Kan. at 131 (quoting *Adolph v. Stearns*, 235 Kan. 622, 626, 684 P.2d 372 [1984]).

In *Robbins* we reasoned that "[i]t is not the place of courts, or lessors, to examine in hindsight the business decisions of a gas

producer." 246 Kan. at 131. We quoted 5 Williams & Meyers, Oil and Gas Law § 856.3, p. 411 (1996): "The greatest possible leeway should be indulged the lessee in his decisions about marketing gas, assuming no conflict of interest between lessor and lessee. Ordinarily, the interests of the lessor and lessee will coincide; the lessee will have everything to gain and nothing to lose by selling the product." 246 Kan. at 131-32. We followed the Williams & Meyers quotation, observing: "The treatise cautions against second-guessing an operator's marketing decision." 246 Kan. at 132.

The difficulty here lies in crafting an even-handed formula because of the lessors' claim of conflict in the interests between Amoco and the lessors. Amoco admits that its obligations as lessee apply independently to each lease. The independent duty principle is applied to prevent Amoco from making the management of a given lease dependent upon the management of another lease. See *Stamper v. Jones*, 188 Kan. 626, 642, 364 P.2d 972 (1961).

At this juncture of our opinion, we repeat a finding of the district court that suggests both the conflict between the interests of Amoco and lessors and the dilemma confronting Amoco by invoking FERC's Order 451. The district court (1) found that Amoco knew that the Smith Class gas dedicated to the 1950 contract was eligible for section 103 and 108 NGPA prices that were "much higher" than average spot market prices that Amoco could receive for released gas between August 1990 and December 1992 and (2) observed in denying the lessors' motion for summary judgment: "It is uncontroverted that the Defendant herein entered into the good-faith negotiations with William Natural Gas and [was] aware of the impact of those negotiations upon the Smith Class 'new' gas prices."

With our teaching of *Robbins*, the purpose of Order 451, and recognition that the gas at issue here was eligible for price negotiation under Order 451 in mind, the district court should apply a reasonably prudent operator standard in deciding whether Amoco properly carried out its implied covenant to market. Amoco's implied covenant to market pricing obligation, under the facts here, is contained within its duty to act at all times as a reasonably prudent operator.

We have noted that *Robbins* requires Amoco to use due diligence to market the gas it produced within a reasonable time and at a reasonable price. When negotiating with Williams Natural Gas under good-faith negotiating provisions, Amoco had a marketing duty to each of its lessors.

It appears that the good-faith negotiating provisions allow a producer and a purchaser to raise gas prices in some contracts and lower gas prices in other contracts. Here, Amoco took advantage of the good-faith negotiating provisions, and the Smith Class royalty payments were reduced. We note that Amoco was also sued by the Youngren Class (*Youngren v. Amoco*, Case No. 89 CV 22) for failing to invoke Order 451 at an earlier time to increase the price of gas produced by their leases. The Youngren Class' (most of Amoco's royalty owners) gas sold for the low maximum lawful prices for old gas. Amoco was faced with conflicting demands either to renegotiate or to not renegotiate. FERC adopted Order 451 to resolve pricing distortions that had resulted from the NGPA's pricing structure. FERC's Order 451 affects Amoco's implied covenant to market. Under the reasonably prudent operator standard, Amoco must not only consider its own economic interest but also take into account the interest of the Smith Class.

An observation made in the American Bar Association Section of Natural Resources Law suggested the situation now before us:

"On June 6, 1986, FERC issued Order 451, 51 Fed. Reg. 22,168 (June 18, 1986), which intended to substantially increase U.S. natural gas reserves and to offer natural gas pipelines a way out of the heavy take-or-pay liabilities they face at the same time that it pushes the gas industry an additional step toward complete deregulation. What Order 451 does is to give producers of natural gas still regulated at low prices under sections 104 and 106 of the Natural Gas Policy Act of 1978 the right to negotiate with their purchasers for higher prices. Of course, leases will remain profitable longer if producers receive higher prices, and so U.S. gas reserves will be increased.

"The catch from the producers' viewpoint is that if a producer requests renegotiation of prices for low-priced gas, it must also lay on the table for renegotiation its higher-priced contracts. The scheme is that low-priced contracts will be negotiated to a higher price more clearly reflecting the value of the gas in the market, while high-priced contracts with heavy take-or-pay obligations will be negotiated to a lower price." Lowe, *Gas Rule May Trigger Implied Covenants Problem*, 2 Natural Resources & Environment 35 Winter (1987).

We do not feel that renegotiating under FERC's deregulation policy should expose Amoco as a common lessee to automatic liability under its implied covenant to market as a reasonably prudent producer. We believe that the better analysis involves a fact-specific approach for evaluating the Smith Class' claim that Amoco's actions under Order 451 breached the implied covenant to market. We reason that the implied covenant to market is to be enforced with a consideration given to the purpose of Order 451. See Ceiling Prices; Old Gas Pricing Structure, 51 Fed. Reg. 46762-63 (1986) (rehearing and clarification of Order 451). FERC also intended the elevated ceiling price scheme to stimulate the production of low-cost gas, "which represents an assured and reliable supply available at the lowest reasonable cost." 51 Fed. Reg. at 46767.

*Sword v. Rains*, 575 F.2d 810 (10th Cir. 1978), reviewed the circumstances of the NPGA's regulatory scheme in evaluating the reasonableness of a lessee's actions. The *Rains* court considered the lessee's action of delaying 10 months in arranging a gas purchase contract and selling the gas on the interstate market. *Rains* held that the lessee did not breach the duty to market with due diligence. 575 F.2d at 813. At the time the lessee attained production, "gas sold in intrastate commerce went for a higher price than that sold in interstate commerce." 575 F.2d at 813. Thus, normally it would have been desirable for the lessee to sell the gas to an interstate purchaser. *Rains* acknowledged that the FPC's Order 428, which allowed small producers to sell gas at prices above the current interstate price ceiling, had greatly influenced the lessee's decision to sell in the interstate market. *Rains* also noted that the lessee's delay in finding an interstate market was due in part to the "rather chaotic and uncertain market conditions resulting from" a federal appellate court decision that "struck down the small producers' exemption." 575 F.2d at 814. *Rains* considered these factors in analyzing the lessee's implied marketing duties under the lease. We agree with the *Rains* analysis.

The purpose of FERC Order 451 was to bring some rationality to natural gas pricing. The balancing approach suggested in *Rains* takes into account particular facts and circumstances affecting Amoco's marketing decision. Whether Amoco has performed its

duty under the implied covenant to market here is a question of fact. *Aldolph v. Stearns*, 235 Kan. at 626. The decision to invoke Order 451 and enter into renegotiation rests with Amoco, which was in a position to evaluate the potential benefits and losses for its lessors. The basic obligation to act as a reasonably prudent operator remains. Amoco should not be allowed to manipulate the procedure to receive an undue benefit for itself. As an oil and gas lessee, Amoco was in control of marketing decisions. The ultimate question for the district court is fact specific and includes the observation in its June 2, 1998, rulings denying summary judgment: Did Amoco's actions under Order 451 breach the implied covenant to market? The task for the finder of fact is balancing any conflict of interest that may follow invoking Order 451 and embarking on good-faith negotiating provisions, tempered by the regulatory background and national policy reflected under the NGPA and the purpose of FERC's Order 451. This balancing of interests is to be linked with the following guidelines reflected in the teaching from *Robbins*:

1. Amoco's conduct will be evaluated by considering " 'what an experienced operator of ordinary prudence would do under the same or similar circumstances, having due regard for the interests of both [lessor and lessee].' " 246 Kan. at 131.
2. Evaluation of Amoco's conduct under the prudent operator standard is a question of fact.
3. The district court must apply the prudent operator standard to the facts as they existed at the time Amoco took the action complained of.
4. The lessors have the burden of proof.
5. The facts are not contested, and Amoco's actions are not patently imprudent; thus, expert testimony will be required to establish a breach of the covenants alleged. 246 Kan. at 131-34.

Reversed and remanded.

DAVIS and LARSON, JJ., not participating.

DAVID S. KNUDSON, J., assigned.
RICHARD W. WAHL, Senior Judge, assigned.